Volume 1

Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAGISTRATE JUDGE ELIZABETH D. LAPORTE

NETWORK APPLIANCE, INC.,          )
                                  )
              Plaintiff,          )
                                  )
  vs.                             )  NO. C 07-6053-EDL
                                  )
SUN MICROSYSTEMS, INC.,           )
                                  )  San Francisco, California
              Defendant.          )  Tuesday
                                  )  May 13, 2008
_____ )  9:12 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**              Weil, Gotshal & Manges, LLP
                                201 Redwood Shores Parkway
                                Redwood Shores, California  94065
                                (650) 802-3000
                                (650) 802-3100 (fax)
                        **BY:  EDWARD R. REINES**
                              **JILL J. HO**
                              **AARON M. NATHAN**

**For Defendant:**              DLA Piper US, LLP
                                2000 University Avenue
                                East Palo Alto, CA  94303-2215
                                (650) 833-2048
                                (650) 687-1166 (fax)
                        **BY:  MARK FOWLER**
                              **CHRISTINE KERBA CORBETT**


**Reported By:**    Lydia Zinn, CSR #9223, RPR
                    Official Reporter - U.S. District Court

```
 1              THE CLERK:  Calling Civil 07-6053, Network Appliance,

 2   Incorporated, versus Sun Microsystems.

 3              MR. FOWLER:  Good morning, your Honor.  Mark Fowler

 4   and Christine Corbett, for Sun Microsystems.

 5              MR. REINES:  Good morning, your Honor.

 6   Edward Reines, Jill Ho, and Aaron Nathan, on behalf of Network

 7   Appliance.

 8              THE COURT:  Well, I want to hear from both sides.

 9   One of the issues that I'm particularly concerned about is how

10   going in either direction impacts the whole case management of

11   this, which is already fairly complicated.  I mean, obviously,

12   it would take some things out for a certain period of time.

13   Still, on the other hand, there's already a lot of things on

14   different tracks.  So that's one issue.

15              Another:  is this an all-or-nothing thing?

16              In other words, if I stay it now, and, you know, it

17   appears that things have really bogged down in the PTO, is that

18   something that I could take another look at later, or is it --

19   -- you know, I mean, I know you'd both be making your arguments

20   at that point about why I shouldn't or should reconsider, but

21   would it make any sense, because, you know, without getting

22   into ruling on sort of the competing statistics, for what

23   they're worth, et cetera, I mean, it's plain there's a range of

24   things that can happen in the PTO.  And things can, you know,

25   abort earlier, or things can drag on at a very excessive, some
```

1  would say, length; certainly, you know, a period of years.  So

2  that's another issue.

3          I mean, in terms of the cases, this is certainly at

4  an early stage.  And that tends to weigh in favor of staying.

5          And, on the other hand, is there any particular

6  prejudice here that's different than the usual case?

7          I mean, really, either way, you know, they're just

8  two different forums.  And both of them are competent to decide

9  these issues.  And the question is:  what makes the most sense

10 here?

11          So those are some preliminary thoughts.

12          **MR. FOWLER:**  Well, your Honor, let me just address

13 the points that you raised.  I think the other points that I

14 would make are all in the papers.  I won't repeat those.

15          With respect to the all-or-nothing aspect of this,

16 the Court, of course, has the ability to revisit any decision.

17 The Court or the parties could do a number of things here.  One

18 is the Court could just stay the prosecution of these patents

19 until there's a decision at some point from the Patent Office.

20 That's one option.

21          A second option is the Court could stay the

22 prosecution of its case as to these patents for a specific

23 period of time, at which time the parties would come back and

24 revisit the issue with the Court.

25          **THE COURT:**  Mm-hm.  Well, I would say I would not

1  stay everything.  I don't think that was even my request.

2       **MR. FOWLER:**  No.

3       **THE COURT:**  Unless that, for some reason -- I know

4  the plaintiff is concerned that there's an -- in their view, an

5  inequality created by staying only some of their patents, but

6  not any of yours.

7       **MR. FOWLER:**  I did not mean to suggest staying the

8  whole case.  I'm only talking about the three patents that are

9  at issue right now --

10      **THE COURT:**  Right.

11      **MR. FOWLER:**  -- so that you could stay it for good;

12 you could stay it for specific period of time.

13           I'm involved in another case right now where there's

14 a motion pending for a stay, I think, of six months.  And at

15 that point if the stay were granted, the parties would go back

16 to the Court and report what's happening in the PTO.

17           Another option would be that the Court just retain

18 its inherent ability to monitor stock.  And if one of the

19 parties wants to come back in and revisit the stay at any

20 particular time -- whether it be six months or seven months, or

21 a year, or a year and a half from now -- the Court could always

22 revisit that issue.

23           I should note, though, on the issue of things getting

24 bogged down, to a large extent -- to the extent that the

25 process in the PTO is going to take a long time, it's in large

1  part going to be in the hands of the patent holder.  Are they

2  going to take extensions?  Are they going to draw the process

3  out in the Patent Office, or are they going to seek a prompt

4  resolution in the Patent Office?  That will definitely impact

5  how long this process is going to take.

6          And if the Court's going to revisit this in the

7  future, I think that's one thing that the Court would want to

8  look at, is to see where the process is being drawn out; not

9  just whether it's being drawn out.

10          **THE COURT:**  And is there -- I think this might become

11  unduly complicated, but apparently, there is a difference in

12  how -- the speed of the *ex parte* versus the *inter partes*.

13          **MR. FOWLER:**  Again, it depends on the statistics.

14  You look at the statistics we've cited to the Court.  I think

15  the difference is a matter of months.  It's both a little over

16  two years, as I recall, so it's not -- it's not a huge

17  difference in the overall scheme of this, considering that

18  there are three litigations going on between the parties right

19  now.

20          **THE COURT:**  Mm-hm.

21          **MR. FOWLER:**  I'd like to move to that point, if you

22  don't mind; that is the issue of different tracks.

23          We have one track in this case right now.

24          We have another case.  There's one track in that

25  case.

1          We have a third case with a --

2          **THE COURT:**  Are we getting some feedback

3  (indicating)?  Is it due to a cell phone?

4          **MR. FOWLER:**  It could be me.  It's got to be away

5  from that one, too.  I'm the offending party.  I apologize.

6          **THE COURT:**  That's all right.

7          **MR. FOWLER:**  We don't have a track in the third case

8  yet because we haven't gotten that far.

9          In terms of this case, I don't not view this as being

10  a multiple-track situation.  First of all, if the Patent Office

11  addresses this issue all the way through, then at least as to

12  the validity of these patents, if the patent claims are

13  canceled, then there's no other track to be had here.

14          **THE COURT:**  Right, but if they're valid or at least

15  enough of them that matter survive -- and I suppose that could

16  be only one potentially -- then we've got to move on to

17  infringement.

18          And they're saying potentially five years later,

19  or --

20          **MR. FOWLER:**  Right.  So there's another possibility

21  in between, your Honor, is that, rather than being canceled,

22  it's amended.

23          **THE COURT:**  Mm-hm.

24          **MR. FOWLER:**  And at that point, things like damages

25  in this case are going to have to -- the clock's going to have

1  to reset.

2          So in the instance of a -- a patent surviving, which

3  I don't think is likely, but in the event that it does, or if

4  it's amended, we have other recourse.  We have two other cases

5  pending.  The Court could slap that patent into one of those

6  other cases, if that's where it falls in the time line.

7          If it doesn't, then the Court, as would be the case

8  in any instances where there's a stay pending a reëxamine, the

9  Court would then hear the patent or patents after the first

10 trial in this case -- I don't think anybody is suggesting that

11 we hold the rest of this case back -- and that, as to the

12 remaining patents, we move expeditiously to the extent we can

13 in this case.

14         **THE COURT:**  Well, what about the argument that

15 there's particular prejudice in this case?  That makes it

16 somewhat different from -- I mean, it appears that this case

17 does, you know, to the extent that there are, you know, other

18 cases, especially looking in this district, I think other

19 things being equal, there's a value to having at least a little

20 bit of predictability that when you come into this district,

21 the judges of this district will handle like cases alike.

22         You know, it doesn't go very far.  There are a lot of

23 other districts.  At least I think it's of some value to the

24 litigants that they look at, you know -- and certainly this

25 case is in a very early stage.  And most of the cases tend to

1  grant stays in that circumstance, I think; but on the other

2  hand, you know, there's an argument that -- but if it creates a

3  great deal of inequality or would create special prejudice to

4  the other side, that would be something that would, you know,

5  render it different.

6         **MR. FOWLER:**  Well, your Honor, I'll deal with, I

7  think, two points that I heard.

8         One:  is there any special prejudice here?

9         I think this case is unique, but not for the reason

10 that there's special prejudice.  It's that there's no evidence

11 of any prejudice at all.  And I'm not just arguing about the

12 evidentiary points that we made.  I'm talking about what's

13 happened already.

14        **THE COURT:**  Mm-hm.

15        **MR. FOWLER:**  This code, which is the accused product

16 in the case -- CFS had been out for almost two and a half

17 years.  And attempting to show prejudice -- there's been no

18 evidence, not even any, really, argument that I can recall,

19 that there's been any harm at all so far.  None.  So you have a

20 track record.

21        **THE COURT:**  In other words, any loss of market share,

22 et cetera?

23        **MR. FOWLER:**  There's been no evidence that a single

24 lost sale has occurred.  There's been no evidence of any

25 diminution in the price that they'd be able to sell.  No damage

1  whatsoever in terms of monetary loss.

2          So we have a situation where there's a track record

3  of two and a half years.  There's been no evidence put forward

4  by NetApp of any harm; much less irreparable harm or a lot of

5  harm.  And that's pretty telling, I think, because they have

6  the burden of showing prejudice.

7          This is not a situation like a lot of cases, where

8  maybe there's a new product coming out that's a hit with the

9  patent.  You're not sure what's going to happen.  And this had

10  been around for a while.

11          And then, as to going forward, I won't belabor the

12  points that we made in our brief, but the showing going

13  forward -- there's nothing there.  It amounts to Mr. Hitz

14  saying, "Maybe."  I mean, I think the -- kind of what really

15  sums up the thrust of what they're saying is he says at one

16  point -- and we quote this in our brief -- "It is not outside

17  of the realm of possibility."  And the way I equate that is:

18  it's probably not going to happen, but it might.  And that's

19  certainly not a showing for irreparable harm.  So I don't think

20  there's any showing of harm.  There's no prejudice in this case

21  at all.

22          And in terms of inequality, the only inequality

23  that's been pointed out is if the Court were to stay these

24  three patents, that in case one, the first case that we're here

25  for today, there would be, I believe, four patents left for

 1  NetApp.  And I believe we would have 12.

 2          And again, as Mr. Reines and I have told the Court

 3  when we've been here before, the parties -- I don't think we

 4  anticipated that all claims of all patents will ultimately

 5  proceed to trial.

 6          **THE COURT:**  Not in one trial.

 7          **MR. FOWLER:**  Right, yeah.  And I suspect that we're

 8  going to be able to tell the Court when we're closer to that

 9  point in time that we're not talking about a 16-patent trial,

10  but that's something that we've both said can happen going

11  forward.

12          And we certainly --

13          **THE COURT:**  Well, and I suppose that, conceivably,

14  could influence -- I mean, if it were a legitimate concern, at

15  that point, I would have the opportunity to consider evening

16  that out.

17          **MR. FOWLER:**  Yes, your Honor.

18          **THE COURT:**  In other words, not saying each cut by

19  50 percent or 75 or whatever; but each remain with one or two

20  patents --

21          **MR. FOWLER:**  Absolutely, your Honor.

22          **THE COURT:**  -- on their side.

23          **MR. FOWLER:**  Just to go back to the issue of the

24  number of patents and the prejudice issue, I want to focus

25  again on the fact that the accused product in this case is ZFS.

1  And that's true for all seven of the asserted patents.  So this

2  is not a situation where NetApp's going to be robbed of its day

3  in court.  It's going to be able to proceed with patents that

4  it says are infringed by ZFS, even if these other patents,

5  which, frankly, are clearly invalid, are subject to reëxam.

6          And, as the Court noted, I think that it's important

7  for two reasons.  As a policy reason to stay this case --

8  first, it's the public policy, as announced by Congress, that

9  this is supposed to be a mechanism that, if followed properly,

10  although it's in the Court's discretion, is something to

11  resolve these kind of issues.  And we've quoted the language in

12  our papers on that.

13          And another situation is -- I agree, your Honor.  I

14  think like cases should be treated alike in this District for

15  predictability purposes.  And we've cited at least six cases

16  that have -- in this District, where it's been specifically

17  stated that the policy, at least in this District, is in favor

18  of reëxamination.

19          And even the two cases that are cited by NetApp for

20  reëxamination were denied, which I believe were the *Clorox*

21  [sic] case and *Frenesius*.

22          **THE COURT:**  *Frenesius* --

23          **MR. FOWLER:**  It's *Comcast*, rather than *Clorox*.  I'm

24  sorry.

25          Those two cases, where reëxam was denied, in both of

1  those cases, the Court went on to say, basically, if --

2  defendant, if you had done this at the beginning of the case, I

3  likely would have granted this stay, but you waited until 18

4  months in one case; 24 months in one instance, after a trial

5  ruling had been reached.

6       **THE COURT:**  That was a little late.

7       **MR. FOWLER:**  That was a little late in the game.  And

8  they wanted to have their cake and eat it, too.  They wanted to

9  go through litigation, see how it went, and then try it.

10          In this case, we filed a reëxam right from the

11  get-go.  As pointed out in our brief, this is no -- we're not

12  trying to hide anything.  In our Rule 26 conference last

13  December, I told counsel that we were going to do this if

14  petitions weren't granted at the CMC that we had in this

15  courtroom.  Following that, we again alerted our court.  It was

16  in our CMC statements.

17       **THE COURT:**  I don't think anybody's saying this came

18  as a surprise.

19       **MR. FOWLER:**  Right.  So, your Honor, unless you have

20  any other questions for me, I think that addresses the

21  questions you've asked.

22       **THE COURT:**  Thank you.

23       **MR. FOWLER:**  Thank you.

24       **MR. REINES:**  Good morning.  I'd like to address the

25  questions you raised and the points that follow from them.

```
 1          First, in terms of case management, the way at least
 2  I understood our discussion and case management conference was
 3  we have more than anybody could possibly digest three times
 4  over.  And what the Court's going to do to manage this is it's
 5  going to force the parties to bring it down to a bite-sized,
 6  adjustable flow and pace.
 7          THE COURT:  That's b-i-t-e, and not b-y-t-e.
 8          MR. REINES:  Exactly.
 9          And that would be relatively -- it would be equal.
10  The Court would be looking to be fair and equal in how it
11  distributed that.  And I think both sides recognize that was
12  sensible.  It may not be exactly the way everyone would like
13  everything, but that was a sensible approach.
14          What this motion is about is removing the ability of
15  NetApp to select which patent claims it wants to pursue, when
16  it's forced to go down to one or two patents from the seven
17  that it has, and basically icing three of them at their
18  discretion -- and they've got a fourth reëxam that they're
19  seeking on another patent -- instead of letting us make the
20  choice.
21          If these patent are fated to nose-dive into the
22  ground, and we're going to lose all our damages and waste
23  everybody's time and waste your time and I'm going to waste all
24  these people's time, then we won't pick that patent when we
25  make the decision; but it seems to me to be fundamentally
```

1  unfair to ask us to ice three patents.

2          Now, what have they proven or shown to anybody in

3  order to justify that?  Why these three patents; not the

4  others?

5          Everybody knows we filed a seven-patent case to

6  initiate this dispute because we believed ZFS was infringing,

7  and it had gotten to the point where it was unsustainable to

8  tolerate any kind of activity with it.  And those were our core

9  patents.  You can debate some within the seven whatever, but

10 that was our thrust.

11         They came back and did 12, and then so on, and so

12 forth.

13         Clearly, that's the centerpiece of our case.  We're

14 not going to tell you otherwise.

15         What have they shown with these three patents that

16 they want to ice?

17         They filed a reëxam request, which is granted in

18 96 percent of the cases.  Shown nothing.  They've shown

19 nothing, because it takes nothing to get the Patent Office to

20 say, "Yes, we'll reconsider it."  It's not like there's some

21 threshold showing that these are sketchy.

22         And to my astonishment, with the '292 patent,

23 which -- to me, the motion just should be denied, frankly.  I

24 know a lot of these problems are complex.  And Counsel comes

25 and tells you they're easy.

1           The '292 patent has an independent claim that the

2    Patent Office refused to even consider reëxamination.  That's

3    like finding a needle in a haystack.

4           So the statement of counsel that they're clearly

5    invalid, when the Patent Office won't even find -- a filter of

6    4 percent of the matters that don't make it to reëxam -- our

7    '292 patent, which is one of the core Hitz patents --

8           **THE COURT:**  Well, I mean, on that --

9           And I want to hear a response on that afterward --

10          **MR. REINES:**  Sure.

11          **THE COURT:**  -- but I take it the independent claim,

12   presumably, is one of your main claims?

13          **MR. REINES:**  It's an asserted claim.  It was in our

14   infringement contentions.  They've filed their validity

15   contentions.  People can call this the early point in the case.

16   I'm not going to win or argue this on the grounds that it's a

17   late stage.  The parties have done their infringement

18   contentions.  The case is essentially worked up to the basics.

19          Yes, we'll have to do some 30(b)(6) depositions.

20   And, yes, there will be documents and everything else; but

21   we've made our infringement case.  They've made their

22   invalidity case.

23          **THE COURT:**  The '292 -- is that one of the *ex parte*,

24   or the --

25          **MR. REINES:**  That's the *ex parte*.  Because of the

```
 1  timing --

 2              THE COURT:  Mm-hm.

 3       MR. REINES:  -- the Patent Office wouldn't even take

 4  it for a reëxam grant, which is a 4 percent or 6 percent or --

 5  whatever, you know.  That is not that refined, that we can

 6  go -- it's infinitesimal; probably on situations where people

 7  didn't make -- meet the requirements.

 8              THE COURT:  In general, the competing declarations --

 9  I mean, they are declarations, but this really, at most, would

10  be akin to a judge trial, in which the rules of evidence are

11  fairly relaxed.  And it really isn't even that.  It's a, you

12  know, sort of points and support of whether to stay or not.

13  And I tend to take from that on the whole that I'm not looking

14  at quantitative evidence, really, but sort of qualitative

15  evidence.  I'll say it to both sides.  I mean, whether I get

16  into the technical rulings or not, I mean, I think that's

17  what's going to be left either way, however I rule.

18              I mean, essentially, there's, you know, discussion of

19  just how fast or how slow.  I don't -- you know, I don't -- I

20  think if -- getting a lot -- very, very specific is sort of

21  pseudoprecision, you know.  That's kind of how I look at the

22  general issue.

23              MR. REINES:  I think it's just two ways of looking at

24  it, just stepping back and looking at it on the -- so the '292,

25  I think I've addressed.
```

1          Having a claim that wasn't put into reëxam removed

2    from our case by them in this kind of procedural maneuver just

3    doesn't seem to me to be a close case whatsoever.

4          **THE COURT:**  Okay.  Even if it's a procedural -- I

5    mean, it can be -- you know, I assume that nobody makes a move

6    in a case unless they think it has a tactical advantage for

7    them.  Nonetheless, that's not of my concern, really.

8          My concern is simply, you know, Congress has provided

9    for two different ways to handle these things.  There is some

10   policy in favor of deferring to the Patent Office to some

11   degree.  And, you know, this case is at an early stage, so that

12   I think your point about the '292 is a good one, but what about

13   the others?

14         **MR. REINES:**  Fair enough.  And let me -- I mean,

15   there's sort of a lot there, but let me just start with:  let's

16   be clear about *inter parte* reëxam.  It's been going on since

17   1999.  Eight years of experience.  Okay.  The total output's on

18   the back end in eight years, with hundreds and hundreds of

19   these things filed.

20         The day that we're waiting for that -- that Sun wants

21   us to wait for has never happened in any of them, ever, in

22   eight years, period.  Stop.

23         **THE COURT:**  Right, but some had been abandoned,

24   presumably because the patent holder may have seen the writing

25   on the wall.

1      **MR. REINES:**  Right.  Out of 300-plus, there have been

2  15 total dispositions.

3      **THE COURT:**  Mm-hm.

4      **MR. REINES:**  Fifteen, out of 300-plus.

5      **THE COURT:**  And the others are still pending?

6      **MR. REINES:**  Yes.  So people haven't been giving up

7  right and left.  I mean, that's just noise.  That's someone

8  missing a filing date, or someone not getting paid.

9      **THE COURT:**  But what about the cases that we have

10 here?  In other words, the goal of being consistent with what

11 other people are doing in --

12      **MR. REINES:**  I mean, I'm hopscotching a little bit

13 because I want to be responsive to everything you're saying.

14 Let me address that one immediately.

15      I read the cases last night.  To me, the cases where

16 they grant reëxams --

17      Well, first of all, the leading case, which is

18 Judge Walker's ASCII 2 case, which was a situation where the

19 patent owner wanted to stay his own case, and was saying -- and

20 the defendant in this case would be analogous to Sun -- was

21 saying, "No, don't do that."

22      And Judge Walker was saying, "Wait a minute.  The

23 patent owner wants to go to the Patent Office and get it ironed

24 out first."  And there's no irreparable harm, compared to the

25 irreparable harm evidence we have here?  And that's when

 1  this -- this favoring reëxam -- and that's sort of been in the

 2  form orders that are not even precedential opinions, right?

 3  That's the one that's the precedential opinion.

 4          THE COURT:  Well, I mean, none of them are

 5  precedential truly; but I do, like I say, think there is a

 6  benefit, other things being equal, to having some uniformity --

 7          MR. REINES:  Right.

 8          THE COURT:  -- because there is a great deal of

 9  discretion in this area.  And if litigants go in and have no

10  idea how the Court's going to exercise that discretion in a

11  given case, that's not terribly helpful to the system as a

12  whole.

13          MR. REINES:  I meant published in Westlaw reporters,

14  as compared to just something that's pulled off Westlaw, where

15  I'm not sure it's attempting to set forth a policy for all

16  time; but if you look at all those cases, there are individuals

17  or holding companies or whatever.  It's not a competitive

18  situation.

19          And, to me, you can get your royalties later.  The

20  delay really -- the argument for delay is almost nonexistent.

21  There is even nothing remotely resembling irreparable harm

22  shown here, in theory or in the evidence we submitted.

23          THE COURT:  I mean, you're showing this is actual

24  market competition with competing products.  That's -- you're

25  arguing that.  And I get that.  And --

1          **MR. REINES:**  Much worse than that, your Honor.  It's

2    not hocus pocus here.  This ZFS is a major initiative which

3    their CFO is blogging about to get everywhere -- this

4    software -- and making it easy for everybody to adapt it and

5    become adopters.

6          And they didn't -- you know, Sun's not been having

7    the best of times.  And they didn't have the best of times for

8    this -- for a long time.  And it's to the point where it's a

9    real issue, where someone like David Hitz will put in the

10    declaration that he put in to you, saying, "We're not going to

11    put the horses back in the barn."  It's not just a competitive

12    Coke/Pepsi situation.  It's Coke, Pepsi, with a little Napster

13    sprinkled in, which is -- it's not sophistry.  That's what it

14    is.

15          **THE COURT:**  Napster makes me smile just because, you

16    know, I have teen-age children who are very interested in that

17    case.  That's all.

18          **MR. REINES:**  So what I'm saying is if we're right in

19    infringement, we're not attempting to win here and prove to you

20    for all time that -- their documents where they're saying they

21    took the ideas that are in the patents go a long way to that,

22    but what we're saying is if there is infringement, they're not

23    only doing it themselves; they're encouraging, you know, in

24    their -- they're saying to companies, "We'll protect you.

25    You're within the umbrella."  And it's going everywhere.  And

1    we're not going to be able to reverse that to wait for a

2    situation where they can't get an *inter parte* to the Board,

3    when exam -- there are three that have gone to the Board,

4    right?

5            **THE COURT:**  What about my question whether there's

6    anything short of, you know -- whether, once it's stayed, do

7    you think that -- would there be any point in saying, you know,

8    "Let's look at this for six months or a year," and then see:

9    is this process totally bogged down?  Have we learned anything

10   from it, one way or the other?  Has the Patent Office basically

11   said, "Actually, we don't think there's much of a problem

12   here," and so the odds start to narrow down as to whether

13   anything really meaningful is going to happen?

14           **MR. REINES:**  We've got a long line.  It's a long

15   queue, like an ATM machine.  And these patents are properly at

16   the front.  And they're significant.  They're important to the

17   matter.  The fact that we initiated the case to prosecute these

18   cases -- that deserves respect.

19           **THE COURT:**  I mean, that's always --

20           **MR. REINES:**  And if it's six months out -- well,

21   there are two things on "It's always."  You could stop every

22   patent-infringement claim ever, selectively, when you want to.

23           **THE COURT:**  But, I mean, you could if you wanted to.

24   Presumably, you could be filing these things against their

25   patents.

1    **MR. REINES:**  We've got some in the filing, so that if

2    it's a goose/gander thing, we could do that onesey twosey, this

3    and that.

4          These are our core patents to this case.  There are a

5    few threads that we have open.  And if I can address a few of

6    them, one is on a tactical disadvantage.  It's not a question

7    of me saying these professionals are doing anything wrong.

8    Tactical disadvantage to a party is a central consideration.

9    All the cases say that.

10    **THE COURT:**  I think I would personally interpret that

11    to mean unfair, or there's something, you know -- every

12    procedural decision always has tactical fallout, but judges

13    don't really consider that, unless there's something somehow

14    unfair about it.

15    **MR. REINES:**  Then that means nothing.  There would

16    never be a tactical -- then the effect of the procedure is that

17    you've iced the patents, and that's always just what it is.

18    That's circular, to me.

19          Let's reset on the precedent, because we're talking

20    about following somebody's Northern District of California

21    cases.  To me, none of them are competitor cases that have any

22    kind of irreparable harm showing.

23          Two is the cases in the reëxam process are, frankly,

24    disturbing, as documented in the declaration of Kunin, and the

25    stats.

```
 1           And if we want to talk about Congressional intent, no

 2   one's more upset about this situation than Congress.  And I

 3   have people collect judicially noticeable stuff I can hand up

 4   to you, including GAO reports, if you want.  There are -- a

 5   thousand examiners left in the last few years.

 6           THE COURT:  I don't know if I do.  I think in

 7   general, I wouldn't go much beyond legislative history, I mean,

 8   or committee reports.

 9           MR. REINES:  There are hearings going on all the

10   time.  The Commissioner of Patents is ordered by May 19th to

11   answer questions of Congress on what's happening with these

12   reëxams.

13           THE COURT:  If there's anything truly within core

14   of -- the actual core, I think, of legislative history, I would

15   let you file that; but I'm telling you if it's not a committee

16   report or, you know, that kind of thing that's really core, I'm

17   not going to look at it.

18           I know there's always controversy about anything.

19   I'm not surprised by that.  It's not going to help me.

20           MR. REINES:  We've got a declaration from the person

21   that set the rules on reëxams --

22           THE COURT:  I have that.

23           MR. REINES:  -- saying how troubling the delays are.

24   If you read your newspaper tomorrow, you'll find that out.

25           And there's also one other thing I wanted to bring to
```

1  you while we're on this.  I think it's relevant -- is there's

2  now basically an admission that the Board of Patent Appeals --

3          **THE COURT:**  -- has a lot of illegal people sitting on

4  it.

5          **MR. REINES:**  There's not even a counterargument.  The

6  only counterargument is we're going to fix it legislatively.  I

7  don't know if that's -- that will be retroactive back to your

8  core point about what fits, all or nothing.  If we wait six

9  months for this, this will never get to the point -- we'll have

10 ten, fifteen patents ahead of it.

11         Seems to me the better way to go is to let us make

12 the decision in the coming months -- I think it's going to

13 happen in the next month -- as to which of these we'll take

14 into account.  The Patent Office -- one of the patents there

15 was -- actually found a rejection in one of them.  And we'll

16 make a decision about what we want to pursue.  That's happening

17 in the next few weeks.  Pursuant to what we've all discussed,

18 we can look at what nets out of that.

19         And as the reëxams progress, we can reconsider

20 perhaps a stay at some later point; but cutting us off where it

21 effectively accomplishes the goal of knocking these, our core

22 patents, out, rather than waiting to see what happens in the

23 reëxam process or all that's happened, as they've said at least

24 with respect to --

25         **THE COURT:**  I know.  You don't have to --

1      **MR. REINES:**  The 211 -- all that did was grant the
2  reëxam.

3      **THE COURT:**  As opposed to they granted it without
4  making a finding of --

5      **MR. REINES:**  No rejection, in stark contrast to '001.
6  To me, a little bit more how, like that on the legal
7  precedents, Northern District of California -- I would start
8  with *Landis*, which is the Supreme Court case as to the
9  standard.  And the standard is:  if there's even a fair
10  possibility that the stay for which one prays will work damage
11  on someone else, I guess it either never could or does -- the
12  suppliant's first stay must make out a clear case of hardship
13  or inequity in being required to go forward.

14      On the other side of the ledger, there's no inequity
15  to them to have to litigate these cases.  It's not like there's
16  a lot more expense involved.

17      **THE COURT:**  No, but it's just a question of -- it's a
18  question of there are two bodies that could be adjudicating
19  this.  Should they both be doing it at the same time, or not?

20      **MR. REINES:**  It won't be at the same time,
21  your Honor.  There will be no effective progress in the reëxam
22  that's in the foreseeable future.  I mean, we've got years of
23  experience with hundreds of them, and 15 have been defaults.

24      **THE COURT:**  Okay.  All right.  I understand what
25  you're saying.  All right.

1              Would you respond on that?

2         **MR. FOWLER:**  Thank you, your Honor.  I'd like to

3    clear up some apparent errors that were made a few moments ago

4    in dealing with the case law.  Counsel said that there were

5    basically troll cases; that there weren't competitors in the

6    cases we cited.  That's incorrect.

7              I'll give you an example that I was able to just pull

8    out quickly:  one of the cases we cited, *Nanometrics versus*

9    *Nova Measuring*.  And on the first page of that decision, under

10   "Background," it stated,

11             The parties are competitors in the

12             business of inventing, designing,

13             manufacturing, and marketing systems that

14             monitor, measure, troll process for

15             semiconductor manufacturing industry.

16             That's one example.

17             Another case I haven't looked at since I've been

18   standing here *Procter & Gamble versus Kraft Foods*.  I'm not

19   sure whether it's Procter & Gamble or Kraft that's the

20   noncompetitor there.  I believe those are two pretty hefty

21   companies that are competing against each other.  And I believe

22   it's also true of other cases that we've cited in our brief as

23   well, so that it's simply untrue to say that the cases that

24   have been decided are not competitor cases.

25             With respect to *Landis*, just as a reminder,

1    your Honor, that's a 1936 case.  It doesn't involve

2    reëxamination.  It's not a patent case.

3            The standard that is adopted -- that has evolved

4    since then, which is the same standard that was cited in

5    NetApp's own papers, is a different standard.

6            **THE COURT:**  I see that.  I think everyone already

7    agrees on that standard, essentially.

8            **MR. FOWLER:**  Okay.  I did want to make that clear if

9    it wasn't clear; that your Honor pointed out that NetApp might

10   file reëxam petitions as to Sun patents.  That's, in fact,

11   happened.  And it kind of begs the question, if it's such a

12   useless, pointless process that serves no good, why NetApp

13   would do that.

14           **THE COURT:**  Presumably, it's so if their claims are

15   stayed, then they will argue that sauce for the goose is sauce

16   for the gander.

17           **MR. FOWLER:**  No doubt, no doubt.

18           **THE COURT:**  What about the '292?

19           **MR. FOWLER:**  I wanted to address the two main points

20   that were made.  That is one of them.  With respect to the

21   '292, there is another petition for reëxamination that's in the

22   works.  That hasn't been ruled on by the Court -- I'm sorry --

23   by the PTO.  That pertains to the independent claim in

24   question.

25           And I would point out that the other claims that are

1  already under reëxamination deal with comparable subject

2  matter, as one would expect, and that the Patent Office and

3  NetApp are going to have communications with each other,

4  presumably about the validity of those.  And the prior art that

5  impacts those other claims is going to have some impact on this

6  other claim.

7        The statements made by NetApp during prosecution,

8  which may have the effect of explaining the claim or narrowing

9  the claim, are certainly going to have an impact on that other

10 claim.  So it's not like we have an outlier out there that's

11 completely free of what might happen in the Patent Office on

12 the other one.

13       And I do expect that the petition will be granted as

14 to that one independent claim.

15       **THE COURT:**  But the petition -- the former petition

16 where that independent claim did not get put into

17 reëxamination, presumably, did ask for that already, so this is

18 the second try?

19       **MR. FOWLER:**  Yes, the art that was -- yes, the art

20 that was primarily directed at the other claims.

21       This art that we've submitted now is primarily

22 directed at this new claim.

23       I wanted to make one or actually two more points, if

24 you'll indulge me, your Honor -- is that the emphasis of

25 NetApp's position is that, well, these are the core patents.

```
 1   And -- which kind of begs:  what are these other patents, and

 2   why are we dealing with them?  But these are the core patents.

 3   And we -- NetApp -- should get to choose what to pursue.

 4            Well, I don't doubt that a plaintiff gets the chance

 5   to choose its patents and to put them into litigation, but I

 6   don't see how that's any different than any reëxamination

 7   situation facing a judge, because the plaintiff has chosen

 8   which patents they want.  Presumably, they've chosen ones that

 9   they believe are strong.  The likely targets of the reëxam are

10   the ones that are going to go under reëxam.  And that's these

11   patents.  These are the ones that presented the best targets

12   for invalidity.  And they're the ones that are in the reëxam

13   process.  So it's not a situation where they simply get to

14   choose.

15            If that were true, then all reëxam -- all motions to

16   stay should be granted or denied, if they just simply got to

17   stand up and say, "We get to choose.  These are the ones we

18   choose.  I don't care if they're in reëxam."

19            And the last point that I found particularly

20   interesting is Counsel said -- and this is not an exact quote,

21   but Counsel said that Mr. Hitz said that the -- you know, the

22   horses are out of the barn; not that they're going to be out of

23   the barn, but they're out of the barn.

24            And I just want to remind the Court -- this will

25   obviously be subject to further analysis in the case -- if the
```

 1 | horses are out of the barn, they're out of the barn.  There's

 2 | no further.  There's no more horses in the barn to leave.

 3 | They're out.

 4 |      **THE COURT:**  Well, but that -- I mean, that wouldn't

 5 | be a reason not to -- for example, if we got to all of this, in

 6 | the end if there's competitors, to not issue an injunction.

 7 |      In other words, the fact that there's been past

 8 | infringement between competitors wouldn't be enough to say,

 9 | "Well, what's the point of issuing an injunction?  It's too

10 | late now."

11 |      **MR. FOWLER:**  Well, that's right, but we would --

12 |      **THE COURT:**  I mean, unless some party was out of

13 | business, but --

14 |      **MR. FOWLER:**  That's something we would deal with down

15 | the road.

16 |      What I'm addressing is this whole notion of the

17 | irreparable harm.  I don't think there's been -- as I mentioned

18 | before, there's been no showing of harm at all.  I don't think

19 | there's any even evidence that shows the possibility of harm.

20 |      What we're hearing instead is, "The horse is out of

21 | the barn, so you've got to act now," but the result would be to

22 | the contrary.

23 |      **THE COURT:**  I think the argument is that things have

24 | reached a tipping point, I think, is what they're arguing,

25 | but --

1           **MR. FOWLER:**  Well, I definitely heard that, but I

2    haven't seen any evidence of it.  I don't know why today's the

3    tipping point.  I don't know why it wasn't a year ago.  I don't

4    know why it wasn't a year from now.  There's no evidence of a

5    tipping point.  There's just the argument that it's the tipping

6    point.

7           **THE COURT:**  Thank you.

8           All right.  Briefly.

9           **MR. REINES:**  Just a few points.  One, in terms of the

10   burden on motion to stay -- nothing's changed.  There's no

11   congressional policy that's changed.

12          If Congress is upset with the way it's being run, the

13   burden's on them.  They've come forward with no evidence of

14   irreparable harm to explain or counter our evidence.

15          Second point on the cases I referred to -- my point

16   was not that no one's a competitor in any of these cases.  No

17   one's made the argument that there's irreparable harm.  No

18   situation where anyone has argued, much less put in evidence

19   from these nonprecedential opinions.  This is a constructive

20   suggestion more than a counterargument thing.

21          The third point is it seems to me that in the next

22   few weeks, we're going to have to hone down from 19 patents to

23   something manageable.  And that's planned to be -- there's a

24   CMC in early June.

25          Again, I really think it would not be fair, based on

1  them just finding the patents that are most scary and filing

2  reëxams on them, to have those excluded from our choice of the

3  ones that we want to pursue.  We're intelligent lawyers.  If

4  there's really a validity problem, we won't want to pursue

5  those.  Makes sense.  So I would collapse this discussion with

6  that discussion.  See what comes out.  We may not --

7          **THE COURT:**  Well, are you saying there's a

8  possibility that you will decide not to proceed on any of the

9  patents -- the three they're taking about?

10         **MR. REINES:**  Yeah, your Honor.  You just said we may

11  go down to one or two at the time of trial.  I think we're

12  going to go through 19 patents in a claim-construction hearing

13  when the Court was talking about ten terms, total is

14  nonexistent.

15         **THE COURT:**  Right.

16         On the other hand, I'm saying you've said that if

17  these are among your core patents, the chances are that I'm

18  going to have to make the decision on the stay.

19         If you're saying you may, nonetheless, whittle it

20  down and decide you don't want to pursue these three patents,

21  you know, immediately, then I would -- I might defer.

22         **MR. REINES:**  The answer to that is with respect to

23  the '292, I don't think there's a basis for a stay motion.

24  Frankly, the fact that they're filing another reëxam starts

25  becoming an abuse of what this thing's supposed to be about.

1    They didn't meet the 4 percent standard.

2            **THE COURT:**  They're taking another crack at it.

3    Understood.

4            **MR. REINES:**  As to the other two, the one that's got

5    rejections on all of them would be a substantial factor we'd

6    have to take into account.  There's so much give and take,

7    guidance from the Court.

8            At some point, if it's four patents per side, which

9    seems like a right amount to me, something around there -- we

10   haven't really started talking numbers at that level -- yeah, I

11   think there's a very, very good likelihood that a '001 patent

12   doesn't make that cut.  So that's why you would be ordering a

13   stay on something that we're effectively not pursuing in that

14   circumstance.

15           As to the one that's been -- the reëxam's granted,

16   but no rejection, you know, then we'd have to see how many the

17   number is; how many claim terms are at issue.

18           **THE COURT:**  Mm-hm, okay.  All right.  I need to move

19   on to the rest of the calendar.  Anything?

20           **MR. FOWLER:**  Well, your Honor, other than just to say

21   I think that with all due respect, we've heard Counsel say that

22   these are the core patents, and these are the ones they want to

23   move forward with.  And now I'm hearing him say, "Maybe,

24   your Honor, if we don't rule now, maybe we might take them

25   off."  I'm not betting that any of those are going to get

1    pulled off the list.

2            **THE COURT:**  I mean, if I -- I guess there's a timing

3    question.  Do I need to decide this right now, or would it be

4    harmful to wait a few weeks?  I know you're doing work on this,

5    but --

6            **MR. FOWLER:**  I don't see any reason why the Court

7    shouldn't make the decision now.

8            **THE COURT:**  I certainly could, but --

9            **MR. FOWLER:**  It would actually help the parties in

10    their efforts, as far as knowing what's left on the table.

11            **MR. REINES:**  Your Honor, it would help us, because it

12    would remove three patents from us to choose.  You understand

13    that?

14            **THE COURT:**  I do.

15            **MR. REINES:**  Thank you, your Honor.

16            **THE COURT:**  We're talking about a few weeks, right?

17            **MR. REINES:**  Yes.  It's a few weeks.  And the '001 --

18    I'm willing to bet Mr. Fowler right now I don't know what the

19    answer is.

20            **THE COURT:**  All right.  Thank you.

21            Can I ask you for simplifications purposes?  Can you

22    just submit a joint chart, maybe tomorrow, just, you know, each

23    patent that the -- you know.  Exactly.  I think a chart would

24    be good.  The status of, you know, *ex parte, inter partes*.  You

25    know, rejected.  You know, just granted, not granted.  You

1  know, what we have just been talking about, these distinctions.

2          MR. REINES:  For these three patents?

3          THE COURT:  Yes, for these three patents.  All right.

4  Thank you.

5          (At 9:45 a.m. the proceedings were adjourned.)

6                          -   -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 07-6053-EDL, Network Appliance, Inc. v. Sun Microsystems, Inc., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

S/S Lydia Zinn, CSR 9223, RPR

Friday, May 16, 2008