MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@weil.com
EDWARD R. REINES (Bar No. 135960)
edward.reines@weil.com
JEFFREY G. HOMRIG (Bar No. 215890)
jeffrey.homrig@weil.com
JILL J. HO (Bar No. 236349)
jill.ho@weil.com
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Attorneys for Plaintiff-Counterclaim Defendant
NETWORK APPLIANCE, INC.,

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NETWORK APPLIANCE, INC. | Case No. 3:07-CV-06053-EDL |
| Plaintiff-Counterclaim Defendant, | **SUPPLEMENTAL JOINT CASE MANAGEMENT STATEMENT** |
| v. | |
| SUN MICROSYSTEMS, INC. | |
| Defendant-Counterclaim Plaintiff. | |

1
2
3
4

Pursuant to the Court's February 12, 2008 Case Management Order, Plaintiff NetApp, Inc. (formerly Network Appliance, Inc.) and Sun Microsystems, Inc. ("Sun") jointly submit this Supplemental Case Management Statement in advance of the June 3, 2008 Further Case Management Conference.

5
6

**CLAIM CONSTRUCTION PROCEEDINGS**

**1. Scope of the Claim Construction Hearing**

7
8
9
10
11
12
13

The Patent Local Rule 4-3 Joint Claim Construction Statement includes 110 claim terms for construction, as well as 18 terms governed by 35 U.S.C. § 112(6) for which corresponding structure needs to be identified.  Of these 110 claim terms identified for construction, 77 of them were identified only by NetApp, 13 were identified by both NetApp and Sun, and 20 were identified by only Sun.  The parties disagree about the proper methodology for narrowing the scope of the claim construction proceedings.

**NetApp's Position**.

14
15
16
17
18
19
20

As discussed at the initial case management conference, the Court expects the parties to trim this case down for claim construction and trial to a manageable size.  As set forth at the hearing on May 13, 2008, NetApp believes that the upcoming claim construction proceedings should be limited to four patents from each side.  This will allow both parties to choose what they consider to be their best patents for an even-handed and manageable proceeding.  While still formidable, learning eight different patents in one claim construction hearing is reasonable given this Court's strong capability.

21
22
23
24
25
26

Under this proposal, there are a flexible number of efficient ways to handle the remaining patents-in-suit that do not make the cut of being among the top four: (1) They can be added to the second or third cases so that there is not a new track, if the biggest concern is multiple tracks, (2) they can be held aside for now in this case, with or without discovery rights, or (3) if dismissal from this case is seen as a better approach, that could work too.  Whichever of these options is selected, NetApp's approach improves the management of this case in an even-handed way.

27
28

Sun's primary response to NetApp's proposal is to ignore the central problem, which is

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that, while the Court reasonably expects a manageable claim construction process, the parties have asserted against each other 322 different claims-in-suit (239 of which are Sun's claims) across 19 different patents.  Instead of confronting this problem head-on by agreeing to do the sensible thing and trim the number of patents based on the extensive infringement and invalidity disclosures exchanged by the parties, Sun oddly attempts to blame the parties for identifying 110 disputed claim terms within the 322 different claims-in-suit.  This defies logic and experience. Far from being irresponsible, the parties have identified approximately one disputed term for every three asserted claims, a ratio sharply below the norm.  And Sun's suggestion that NetApp is somehow misbehaving based on the number of disputed terms is empty rhetoric.  The fundamental problem that the Court and the parties need to address is not simply the number of disputed terms, but rather the overall scope of asserted patents, which gives rise to those disputes and renders a one-track claim construction process unworkable.  Sun's stubborn refusal to face this fact – that it is unreasonable and impractical to ask the Court to understand 19 different patents, and up to 322 asserted claims concerning everything from microprocessors to website structures to software architecture in one claim construction hearing – places its whole position on a foundation of quicksand.

Likewise, Sun's attempt to equate NetApp's proposal with its own stay motion is a false argument that ignores NetApp's basic position:  NetApp is open to any reasonable proposal about how to address the problem that everyone, including Sun in this very document, has acknowledged:  there is an excess of patents and claims and there are too many claim construction disputes arising from them to address in one hearing.[1]  Thus, whether patents not selected for the first wave are dismissed (as proposed by <u>Sun</u> during the parties' discussions), or stayed, or available for discovery, the key concern is that the case be managed in a sensible way. NetApp's proposal achieves that by narrowing the issues to a discrete set of 8 patents, and

---

[1]  Moreover, Sun's reference to Congressional policy in this regard is perplexing.  Any conceivable Congressional policy supporting a stay of reexam is predicated on there being "special dispatch" in the reexam process.  In fact, the reexam process is so slow that even Sun does not argue that there is anything resembling special dispatch.

allowing each party a free hand to select its own four patents for claim construction at this stage.

Sun proposes, by contrast, that the parties be allowed to pursue all their patents through claim construction, limiting the parties to 40 claim term disputes (20 per side) among the 322 asserted claims – 239 of which are Sun's asserted claims. Sun presumably wants to pursue 12 of its patents, while allowing NetApp to pursue six or fewer patents. As evidenced by its argument here, Sun will seek to stay as many of NetApp's patents as possible by continuing to pursue more reexams (in addition to the three original requests, two more requests have been filed), which would easily tie those patents up for years.

Sun's proposal suffers from several severe problems. As noted above, it essentially asks the Court to understand 19 different patents, and up to 322 asserted claims – concerning everything from microprocessors to website structures to software architecture – in one claim construction hearing. That is unreasonable. Essentially, rather than making intelligent judgments now about which are the top patents it wants to prioritize, Sun is forcing the Court to wrestle with all of these complex patents, which will only serve to burden the Court and slow the case.

In fact, the parties are in a position to prioritize their patents now. They have exchanged the infringement contentions and invalidity contentions demanded by the Patent Rules since January and, indeed, have memorialized their resulting claim construction debates in the Joint Claim Construction Statement filed last week. Counsel should bear the responsibility now of trimming this case to a more reasonable size – instead of pushing the burden of an omnibus claim construction hearing to the Court.

Aware that such a claim construction hearing is impractical, Sun proposes an arbitrary 40 claim term limit from among the 322 asserted claims containing thousands and thousands of claim limitations. Make no mistake about it, construing 40 terms from 19 patents offers the worst of all worlds. It inflicts the real burden of understanding so many patents and construing so many terms, but without resolving all the meaningful claim construction disputes that obviously arise from 322 asserted claims. Such a large number of patents in complex technology involving so many asserted claims has understandably resulted in the identification by the parties of

approximately 110 disputed terms.  That the parties' discussions have, to this point, been unsuccessful in reducing this number in any meaningful way suggests that these disputes are fundamental and enduring in nature, and not simply the product of over-eager designation during the claim construction exchange process.  Indeed, the parties agreed during the meet and confer conference that their differences concerning the proposed constructions were so substantial that it did not make sense to confer further about more than approximately 20 terms.  The fundamental lack of agreement is particularly important, because Sun's hard-cap of 40 terms ignores the requirement that <u>all</u> claim terms that are meaningfully disputed <u>must</u> be construed by the Court at the risk of error.  Just last month, the Federal Circuit provided another reminder that undue limits on the number of terms for construction can cause error.  *See O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351 (Fed Cir. April 3, 2008) (vacating and remanding the verdict:  "When the parties raise an actual dispute regarding the proper scope of the claims, the court, not the jury, must resolve that dispute.").  This cardinal legal principle is why the Patent Rules Committee and Judge Whyte refused to adopt a limit on the number of terms for construction per case, despite the desire in some quarters for such a rule.  With 322 asserted claims at issue, permitting each side to identify only 20 claim terms for construction invites all the problems attendant to an incomplete claim construction process.

In the end, the choice for the Court is between thoroughly addressing each side's best four patents in an organized and efficient proceeding or performing the less welcome job of adjudicating claim construction disputes among 322 asserted claims in 19 patents, with the parties only later picking and choosing their preferred patents – and identifying additional unresolved claim construction disputes before, during and/or after trial.

While it is crystal clear to NetApp that its proposal is far more workable for the Court (indeed, for all concerned), for this approach to make sense, it is important that the Court not stay the case as to the selected patents of the parties.  It would be fundamentally unfair to narrow the case to selected patents only to stay those patents and, in any event, the procedural posture and stage of the case would then counsel against further stays.

**Sun's Position**

While NetApp strongly opposed Sun's motion for partial stay, arguing the parties should be able to select for themselves which patents they believe are the best to pursue, NetApp now argues Sun should be forced to arbitrarily limit the number of patents-in-suit Sun may assert now by two thirds. In so arguing, NetApp seeks to dramatically reshape the existing contours of this case, in which Sun currently asserts 12 patents and NetApp asserts 7 patents (one of which is the subject of a stay order), by equalizing the number of patents each party may assert now to four (and effectively invoking a stay as to the remaining patents). NetApp's proposal would result in a stay as to only two NetApp patents, while eight Sun patents would be subject to a stay. Thus, while NetApp bathes its proposal in the words of "reasonable" case management, NetApp seeks to gain a substantive and tactical advantage, and to severely prejudice Sun, through shelving the majority of Sun's patents-in-suit and by changing the relative number of patents being asserted by each party (from roughly a 2:1 ratio to a 1:1 ratio). NetApp's proposal is particularly ironic given its vehement opposition to Sun's motion for partial stay (which was granted as to one patent, but denied as to two patents), as Sun's motion was based on express congressional intent and case law supporting a stay as to patents in reexamination, while NetApp now seeks to effectively impose a stay as to eight Sun patents when no congressional intent or case law supports the request.

Significantly, the concerns raised by NetApp are largely of its own making. Specifically, NetApp's undisciplined identification of the claim terms to be construed resulted in the "problem" NetApp now seeks to solve at the expense of the number of patents Sun may assert. The parties identified a total of 110 claim terms for construction, as well as 18 terms governed by 35 U.S.C. § 112(6) for which corresponding structure needs to be identified. Reflecting NetApp's "throw mud at the wall" approach to claim construction, 77 of the 110 claim terms were identified only by NetApp, while only 13 were identified by both NetApp and Sun, and 20 were identified by only Sun. Sun should not be required to drastically limit the number of patents it can assert now simply because NetApp seeks to clog the process with dozens of claim terms not

requiring construction.[2]

Moreover, NetApp initiated this lawsuit, asserting infringement of seven patents, and NetApp knew then (as evidenced by its declaratory relief claims as to Sun patents) that Sun contended NetApp broadly practiced the patents in Sun's patent portfolio. The parties are before the Court with many patents because NetApp decided to initiate litigation rather than continue the parties' licensing discussions. Having chosen the path of litigation, NetApp should not be permitted to limit Sun's ability to assert its counterclaims against NetApp.

*Sun's Proposal*: Sun proposes that each party identify up to 20 priority terms for claim construction. The 20 terms could be selected from any of the 20 patents-in-suit. There would be no requirement that a priority term must be identified for each patent-in-suit (thus, not all patents necessarily would be subject to claim construction), nor would there be any cap on the number of terms that could be selected for a given patent. Rather, each party would focus its 20 priority claim terms on the claim construction issues it deems most important in this case.

If both parties identify 20 terms, and if there is no overlap on the parties' respective lists, the Court would be asked to construe 40 terms. If the parties identify fewer than 20 terms, or if the parties' lists overlap, the Court would be asked to construe fewer than 40 terms.

If the Court determines that 20 priority claim terms per side is too many terms to construe at this time, Sun is prepared to proceed as to any number of claim terms the Court deems reasonable. Furthermore, if the Court concludes that more than a single day would be required for a *Markman* hearing, or that it would be useful to the Court to prepare for and hear argument on different claim terms at slightly different times, the Court could schedule the Markman hearing to be heard on multiple days (or parts of different days). For example, the Court could schedule a specified number of claim terms be argued at a first hearing, that a second group of terms be

---

[2] The parties' Joint Claim Construction Statement was due to be filed by midnight on Friday, May 23, 2008. Reflecting NetApp's unorganized and unprincipled approach to claim construction, and ignoring the structured approach and timeline for claim construction imposed by the Patent Local Rules, in the five hours preceding midnight (and even following midnight), NetApp (1) modified the construction of approximately 45 claim terms and (2) identified an entirely new claim term for construction.

scheduled for hearing a week or two later, and that a third group of terms be scheduled for hearing a week or two thereafter. This would permit ample time for all claim construction issues to be addressed, and would permit the Court additional time to prepare before hearing argument. This approach also would avoid the harsh staging approach proposed by NetApp, which essentially would turn this single case into two cases.

_Bases For Sun's Proposal_: Sun's proposal permits the parties to focus the Court on what the parties identify as the key claim construction issues in the case. Indeed, Sun's proposal is consistent with the Court's February 12, 2008 Case Management Scheduling Order, wherein the Court advised the parties that it "will likely require them to prioritize disputed patent claims as set forth in new Patent Local Rule 4-1(b)."

In this regard, the Court recently revised the Patent Local Rules to provide that the "parties shall also jointly identify the 10 terms likely to be most significant to resolving the parties' dispute, including those terms for which construction may be case or claim dispositive." Patent Local Rule 4-1(b). Sun's proposal is consistent with the Patent Local Rules by prioritizing the key claim terms for construction across the case in terms of whether they may be case or claim dispositive. On the other hand, nothing in the Patent Local Rules provides or suggests some patents should be placed on hold until after trial while others are construed and tried.

Moreover, contrary to NetApp's current assertion, Sun's position provides for ample claim construction in this case – up to 40 priority terms. Sun identified only 33 non-means-plus-function terms for construction (13 of which NetApp also identified), and Sun certainly can identify 20 (or fewer) of those 33 terms for priority construction by the Court. NetApp's current position appears to spring from its lack of disciplined analysis –identifying a whopping 90 non-means-plus-function claim terms for construction. NetApp does not offer any justification why that many (or even most) of these terms require construction.

Indeed, for much the same reason, NetApp's reliance on _O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd._, 521 F.3d 1351 (Fed. Cir. 2008) is misplaced. Contrary to NetApp's assertion, the Federal Circuit did not hold that "all claim terms that are disputed must be

construed by the Court at the risk of error." In fact, the Federal Circuit expressly stated that "[w]e, however, recognize that district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *Id.* at 1362 (emphasis in original). The Federal Circuit instead stated claim construction should occur "[w]hen the parties present a fundamental dispute regarding the scope of a claim term." *Id.* at 1362.

Here, NetApp argues that the parties' discussions have been "unsuccessful in reducing the number in any meaningful way suggests that these disputes are fundamental." NetApp ignores, however, the fact that the parties have engaged in only ***one*** meet-and-confer conference on the subject of claim construction that lasted 1.5 hours (during which the parties did not agree, as NetApp represents, to limit its discussion to 20 terms). During this call, the parties agreed to hold a further meet-and-confer conference to narrow the disputes regarding claim construction. While Sun has been prepared two times to conduct this further meet-and-confer conference, NetApp's counsel preferred to not address the claim construction issues until the Court resolved the parties' dispute regarding the methodology of the claim construction process.[3] As such, given the limited number of discussions, it is disingenuous for NetApp to now argue that such discussions have been unsuccessful.

Based upon their experience in other patent cases, the parties' counsel consistently have told the Court the number of patents-in-suit most probably will drop before trial. However, Sun has contended this will result from the typical progression of patent cases, wherein parties reassess the strength of their claims and defenses following a *Markman* ruling, and again after motions for summary judgment are filed and ruled upon, and once again as the case is prepared for trial. Based upon past experience, Sun continues to expect this likely will occur in this case. Notably, this typical process results in streamlining the case through the actual ***dismissal*** of patents rather than staging (or postponing) of groups of patents over time as NetApp proposes.

---

[3] On May 27, 2008, Sun's counsel, again, requested a further meet-and-confer conference to take place on May 29, 2008. NetApp has agreed to this further meet-and-confer conference. As such, the parties continue to engage in the meet-and-confer process with respect to claim construction.

Moreover, it is simply too early in the case to determine which patents should and should not proceed to trial when virtually no discovery has taken place to date.

NetApp also responds to Sun's proposal with assertions regarding the number of technologies and claims potentially at issue. However, NetApp does not explain how limiting the number of patents to eight would necessarily narrow the number of technologies at issue. (NetApp's assertion appears to be based upon the false premise that all 20 patents concern different technologies.) Moreover, if NetApp's assertion were true and the Court were to adopt NetApp's proposal, that would mean the Court would exclude certain technologies (i.e., accused NetApp products) from the initial scope of this case. It would be prejudicial to Sun to effectively exclude infringing products from the initial scope of this case.

As to the number of claims at issue, NetApp argues the Court may need to understand 340 asserted claims during the claim construction phase. This is inaccurate. Of the asserted claims, 198 claims include terms that listed to be construed and, of those, only 66 are independent claims. Moreover, should the parties submit only 40 terms for construction, the number of claims at issue would drop significantly.

_Additional Problems With NetApp's Proposal_:  As NetApp is doing now, at the time of the first Case Management Conference, NetApp proposed a multi-track schedule whereby different patents would be construed and tried at different times. For the good reasons articulated at the time, the Court rejected NetApp's proposed multi-track approach to this case. Yet, NetApp's proposal is another multi-track plan by which different patents would be placed on two different schedules, with one set of patents being construed and tried at one time, and another set of patents being construed and tried at another time, with no clear justification for segregating the patents in such a manner. This proposal would not simplify or streamline the case, but rather would complicate and extend the length of the case.

Moreover, while NetApp touts its proposal as one to "trim down this case…for claim construction and trial…," NetApp's proposal would do exactly the opposite. Under NetApp's proposal, the parties would construe an _unlimited_ number of claim terms for eight patents now.

Applying this proposal to eight of the current patents-in-suit and to the current list of claim terms would result in 76 claim terms (including means plus function terms) being construed. Thus, depending in part on which patents are selected for the "initial" claim construction and trial phase of the case, little, if any, efficiency would be achieved. Indeed, after factoring in the fact that a second round of claim construction and a second trial would be required, NetApp's proposal clearly would render the process less, not more, efficient.

NetApp also argues, in the alternative, that the 12 patents not selected for infringement could be added to the second or third case between the parties, thereby allegedly avoiding a multi-track case. This argument is completely lacking in merit. NetApp's proposal would merely shift 12 patents to the second or third case, thereby resulting in a 23 patent case in the second case or a 20 patent case in the third case. As such, NetApp's proposal merely would defer the resolution of this issue by two or three months rather than resolve it.

NetApp also argues that dismissal of the 12 remaining patents "could work too." Of course, NetApp is free to dismiss any of its patents if it wishes to do so, but it has not done so. And forcing Sun to dismiss eight of its patents at this early stage of the litigation – before there has been any substantial discovery –would be unfair.

Finally, NetApp's argument concludes by asserting that, if the Court adopts NetApp's proposal, the Court should not later issue a stay as to the four patents selected by NetApp. Although NetApp does not explicitly say so, this assertion is, of course, directed to the NetApp patents in reexamination in the PTO. The Court already stated, in its May 27, 2008, Order, that the Court is willing to reconsider issuing a stay as to the NetApp '211 and '292 patents in reexamination if subsequent events in the PTO warrant granting such a stay. If such circumstances occur, such as a PTO rejection of the asserted claims of these patents, Sun will reapply for a stay as to those patents. NetApp is on fair notice that if the Court adopts its proposal, and if NetApp then selects the '211 or '292 patents to pursue, those patents may be later stayed for good cause shown due to their status in the PTO. If the Court adopts NetApp's proposal, NetApp should weigh the risk of the PTO's rejection of the claims of the '211 and '292

patents (which is likely to occur given the strength of the prior art being asserted against those patents) in deciding which patents to select. Moreover, this issue would be avoided altogether if the Court does not narrow the number of patents to be construed at this time.

### 2. Patent Local Rule 2-1(a)

With respect to the topics listed in Patent L.R. 2-1(a), the parties do not believe, at this time, that there is a need for any specific limit on discovery related to claim construction. In light of their dispute concerning the scope of claim construction proceedings, the parties believe that it is premature to address whether live testimony should be heard at the claim construction hearing, the order of presentation, or the length of the hearing at this time. The parties will discuss these issues with each other after the Court resolves this dispute and will make a joint proposal to the Court concerning the logistics for the *Markman* hearing.

### ADDITIONAL ISSUES

### 1.   Document Production

*Sun's Argument*: Despite NetApp's repeated remarks to this Court that it is prepared to move expeditiously in this case, NetApp's actions (or inactions) show the contrary. Not only is NetApp dragging its feet in scheduling depositions, but NetApp has failed to produce substantive documents. The parties agreed to begin rolling document productions on May 16, 2008. Not including documents produced pursuant to the patent local rules, Sun has produced 13,598 documents, while NetApp has only produced a meager 746 documents (which consist mainly of publicly available manuals). At this rate, the parties will be unable to complete document productions and depositions prior to the fact discovery cut-off date which is set for October 13, 2008. Even more troubling, given that it appears that NetApp is withholding making its deponents available for depositions until it has completed its document production vis-à-vis the deponents , Sun has been and will continue to be prejudiced by this delay.

*NetApp's Argument*: This "dispute" is a non-issue and should not have been raised with the Court. The parties agreed to begin a *rolling* production on May 16. In the ensuing week,

NetApp produced more than 100,000 pages of responsive documents. In total, NetApp has produced in this case 1,624 responsive documents totaling more than 150,000 pages, and expects to continue this rolling production expeditiously until it is complete. In addition, in January 2008, NetApp provided Sun's outside counsel with an account for its NetApp On the Web website, thereby providing access to substantial documentation for accused and embodying products. Moreover, NetApp made source code for its DataONTAP software (which both embodies NetApp's patents-in-suit and is accused of infringing certain of Sun's patents) available for inspection pursuant to paragraph 11 of the Protective Order on May 15. And despite the urgency professed in its argument here, Sun has inspected this code just once, for several hours, in the nearly two weeks that it has been available. Sun's posturing notwithstanding, both parties are moving forward with their rolling productions and NetApp expects to satisfy its discovery obligations in the timeframe set by the Court.

### 2.    Consent for Production of Documents in a Prior Litigation

*Sun's Argument*: Sun contends that at least a portion of the inventions claimed in some of the patents that NetApp asserts against Sun, including the purported invention claimed in United States Patent No. 5,819,292, was wrongfully misappropriated by NetApp in 1991 and 1992 from The Whipsaw Group joint venture. In July 1994, The Whipsaw Group joint venture and its individual members filed a lawsuit against NetApp, Michael Malcolm and other defendants (Whipsaw Group, et. al. v. Network Appliance Corporation, etc. et. al., Case No. CV 742186 in the Superior Court of California, County of Santa Clara ("the Whipsaw Litigation"). Mr. Malcolm is a named inventor on the '292, '211 and '352 patents. The lawsuit alleged, among other claims, misappropriation of trade secrets. On August 14, 1996, days before trial was scheduled to begin, NetApp and its insurers agreed to pay $4,400,000 to settle the Whipsaw Litigation. The subject matter of the litigation concerned the origin, inventorship and ownership of file storage technology, including technology substantially similar to that disclosed and claimed in the asserted '292 patent.

In January 2008, Sun's counsel issued a subpoena to Orrick, Herrington & Sutcliffe, Mr.

Malcolm's legal counsel in the Whipsaw Litigation, for all documents related to the Whipsaw Litigation. Orrick's counsel has represented that Orrick possesses several boxes of documents regarding the Whipsaw Litigation. Orrick's counsel further represented that it will not produce the responsive, non-privileged documents that were labeled "confidential" without the consent of the litigants. Sun has obtained the consent from all of the litigants except for NetApp and Mr. Malcolm. Only after Sun's counsel had gone through considerable effort to obtain the consent of the various third parties related to the Whipsaw joint venture, during which process NetApp and Mr. Malcolm raised no complaint about the production of the documents, NetApp's current litigation counsel (who represents both NetApp and Mr. Malcolm) recently indicated that NetApp and Mr. Malcolm will not consent to the production unless it has an opportunity to review the documents prior to production to determine whether there is any concern with the production of the documents. There is no legal basis for NetApp or Mr. Malcolm to impose a "consent" or "prior review" requirement on the production of relevant documents that are responsive to a subpoena served on a third party.

Now, on the day of this filing, NetApp's and Mr. Malcolm's current counsel advanced a new argument for further delaying the production of these documents. According to NetApp's and Mr. Malcolm's current counsel, NetApp and Mr. Malcolm will not consent to the production of documents without their current counsel (Weil) having an opportunity to review the entire production for privilege. This position is untenable. Mr. Malcolm's former counsel, Orrick, hired a reputable third-party law firm to review the documents in its possession for privilege. Mr. Malcolm cannot further delay this four-month old subpoena by now arguing that he needs his current counsel to *re-review* the documents for privilege.

Finally, any concerns regarding confidentiality (or any other concern) may be addressed by the protective order in place in the current litigation. Therefore, Sun respectfully requests that the Court order NetApp and Mr. Malcolm to provide their consent to its former litigation counsel in the Whipsaw Litigation to produce their documents from the Whipsaw Litigation that are responsive to Sun's now four-month old subpoena.

*NetApp's Argument*:  Sun seeks to deprive Mr. Malcolm and NetApp of the opportunity to have counsel of their own choosing conduct a final review of documents being produced by Orrick's outside lawyers to screen for privilege, work product, and other confidentiality issues. This position is simply untenable, particularly in light of the nature of documents at issue.

Orrick represented Mr. Malcolm, a NetApp founder and former employee, in connection with the *Whipsaw Group v. Network Appliance* litigation, referenced above, which terminated more than 10 years ago.  Upon receiving Sun's subpoena, Orrick retained another law firm, Schwartz & Cera LLP, to respond to the subpoena and produce responsive documents from Orrick's files.  Earlier this year, Scott Lovernick of Schwartz & Cera contacted Mr. Malcolm's current counsel (Weil Gotshal) to request consent from both Mr. Malcolm and NetApp to produce documents responsive to the subpoena.  Weil Gotshal informed Mr. Lovernick that both Mr. Malcolm and NetApp consent in principle to the production of responsive documents, but are concerned about the risk of production of privileged and work-product-protected documents, given that responsive documents were to be collected and produced from Orrick's files.  Thus, Weil Gotshal informed Mr. Lovernick that neither would provide its final, written consent until Weil Gotshal had an opportunity to screen the production documents for privilege, work product, and other confidentiality issues.

Today, Mr. Lovernick informed Weil Gotshal that the documents are not yet ready for production, because Schwartz & Cera has not completed its review, but that this review is likely to be complete later this week or next week.  Once Schwartz & Cera's review is complete, the documents, comprising between 20 and 25 bankers boxes, will be made available to Weil Gotshal for a final screening.  Mr. Lovernick further informed Weil Gotshal that although the boxes include documents that were produced, exchanged, or filed in the *Whipsaw* case, they also include documents and drafts that are internal to Orrick.  Unfortunately, the internal documents and drafts are interspersed through the 20-25 boxes, and it is not possible to separate them as a class in any meaningful way.

Although the lawyers at Schwartz & Cera no doubt conducted a thorough review of the

documents before selecting them for production, the existence of internal documents and drafts in the production, and the fact that the production originates with a law firm, raise substantial concerns that privileged or work-product-protected documents will be produced inadvertently. Consequently, it is simply unreasonable for Sun to demand that Mr. Malcolm (and NetApp, whose privilege is implicated by joint defense issues) to consent blindly to the production of these documents.

Dated:  May 27, 2008                    /s/ Jeffrey G. Homrig
                                        Matthew D. Powers
                                        Edward R. Reines
                                        Jeffrey G. Homrig
                                        Jill J. Ho
                                        WEIL, GOTSHAL & MANGES LLP
                                        201 Redwood Shores Parkway
                                        Redwood Shores, CA 94065
                                        Telephone: (650) 802-3000
                                        Facsimile: (650) 802-3100

                                        Attorneys for Plaintiff
                                        NETAPP, INC.


Dated:  May 27, 2008                    /s/ Christine K. Corbett
                                        Mark D. Fowler
                                        David Alberti
                                        Christine K. Corbett
                                        Yakov M. Zolotorev
                                        Carrie L. Williamson
                                        DLA PIPER US LLP
                                        2000 University Avenue
                                        East Palo Alto, CA 94303-2215
                                        Telephone: (650) 833-2000
                                        Facsimile: (650) 833-2001
                                        Attorneys for Defendant
                                        SUN MICROSYSTEMS, INC.