UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NETWORK APPLIANCE, INC., <br><br> Plaintiff-Counterclaim Defendant, <br><br> v. <br><br> SUN MICROSYSTEMS, INC., <br><br> Defendant-Counterclaim Plaintiff. | CASE NO. C-07-06053-EDL <br><br> **DECLARATION OF DR. MARTIN E. KALISKI IN SUPPORT OF SUN MICROSYSTEMS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

I, Martin E. Kaliski, Ph.D., declare as follows:

1. The facts set forth in this declaration are based on my personal knowledge and experience. I would competently testify to these facts if called upon to do so.

2. I hold a doctoral degree (PhD) in Electrical Engineering, granted by the Massachusetts Institute of Technology ("MIT") in 1971, as well as a Master's degree in Electrical Engineering from MIT and two Bachelor's degrees (Electrical Engineering and Mathematics), also from MIT. I was the Chair of the Electrical Engineering Department at California Polytechnic State University, San Luis Obispo ("Cal Poly") for nine years (1989-92; 1995-2001), and after 35 years of teaching in the fields of Electrical Engineering, Computer Engineering and Computer Science, I retired in 2007 and am now a Professor Emeritus in Electrical Engineering at Cal Poly.

3. I have been active in research and consulting in the fields of computer science,

software engineering, electrical engineering, systems design and analysis, as well as in related algorithm development for over 35 years. My main areas of interest are systems theory, computer systems, software systems, industrial systems and control systems. Typical project areas have included software and hardware design recovery, software quality assurance, remote tracking technologies, algorithm development for CAD/CAM systems and expert systems in industrial automation applications, trouble-shooting fault-detection microcode, software engineering for advanced signal processing applications, development and implementation of algorithms for finite-state controller design, design of disk head assembly fault diagnostics, development of expert systems for verification and analysis of BIOS software, development of training manuals, classical expert system design, software design recovery research in transportation engineering and expert system approaches to telephone system reliability. I am the co-author of three textbooks and the author of numerous technical publications. I have had teaching and consulting experience with computers both large and small, ranging from mainframes to microcontrollers.

4. I have been engaged as an expert witness in numerous technology-based matters for the past eleven years, with a focus on patent infringement, trade secret misappropriation and copyright infringement. Cases have covered such diverse areas as machine vision, electronics packaging, data encryption, mainframe and microprocessor based software, health care management systems, web-based technologies, computer networking, television systems and video gaming. Many of these cases directly or indirectly addressed the issue of independence of software and hardware development.

5. I have been engaged by Sun Microsystems, Inc. as a technical expert in this case. A copy of my curriculum vitae is attached hereto as Exhibit A. A list of references on which I relied upon for my analysis is attached as Appendix A. I am being compensated at my normal hourly rate of $425.

6. Based on my review of U.S. Patent No. 5,925,106 (the '106 patent), including the patent claims, specification, file history, and other relevant documents it is my opinion that the level of skill in the art pertaining to the '106 patent is an engineer having a bachelors of science degree in computer science or equivalent with two years of experience with software

-2-

development and networked computer systems. In this vein, I believe that Dr. Almeroth's definition for one of ordinary skill in the art of the '106 is too restrictive and suffers from the same flaw as his analysis of the claim terms of the patent (see below): it is too tied to the exemplary preferred embodiment of the patent.

7. The basic problem addressed by the '106 patent is the following one: how we can provide a mechanism that permits a client in a client-server architecture to obtain information about a server to which it is connected and to display such information? [Abstract to '106 patent]. Servers can be accessed over the Internet *or* over other (local) computer networks using their domain names. Domain names are names that have numerical IP addresses associated with them. Servers can be distinguished from other servers by "server identification data," i.e., data that more intuitively or more descriptively differentiates one server from another. ['106 patent at 5:63-67.] Server identification data thus includes information that describes or identifies the server to the client (as opposed to the contents of the files on the server which might be passed to the client.). ['106 patent at 1:54-2:20, 2:23-2:33.]

8. Although the preferred embodiment of the patent couches this problem in terms of "appending" server information to a URL that accesses a world-wide web page on a server (e.g., '106 patent at 5:33-5:42), the scope of the patent is much broader than this. The specification expressly states the WWW context is just one example, as the invention covers obtaining information from any type of network server, such as a server on a private network. ['106 patent at 1:32-34, 2:23-56, 4:5-10, 24-26. The patent teaches how to request descriptive information about a server by, for example, the client (user) computer querying the server for such information. ['106 patent, 6:22-26.] The patent also teaches how to accomplish such queries by the client to the server. '106 patent, col. 6:22-36. The patent discloses displaying information about the server using software resident on both the client and the server. ['106 patent, Figs. 5, 6, 6:22-7:55.]

9. While it is true that some of the dependent claims are directed to the World Wide Web (WWW), URLs, HTTP usage and specific query commands (e.g., claims 5-8, 11-13, 18-21, 24-26, 31-34, 37-39), the '106 patent includes many other broader claims that are related more

-3-
DECL. OF DR. MARTIN KALISKI ISO SUN'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF; CASE NO. C 07-06053 EDL

generally to providing server information to the client over a network and to display it (e.g., claims 1, 4, 9, 10, 14, 17, 22, 23, 27, 30, 35, 36 ). Thus the '106 patent is more generally concerned with giving a client more information about a server to which it is connected rather than solely the WWW-based implementation disclosed as the preferred embodiment.

10. Dr. Almeroth's approach to claim construction for the '106 patent is intrinsically flawed and I strongly disagree with it. Simply put, he is guilty of both reading limitations from the preferred embodiment into the claims of the patent, and his analysis also ignores the fundamental principle of claim differentiation, as explained below.

11. One striking example of this is his construction of "domain name" to mean "a third-party approved name of a website on the Internet, i.e., a registered domain name." (Almeroth Declaration, p. 5., C.1) Ignoring, for the moment, the circular nature of his definition (wherein "domain name" is defined in terms of "domain name"), his reasoning is flawed for a number of important reasons.

12. First, the patent specification clearly explains that concepts such as the Internet, "WWW", "URLs" and "HTTP" are merely representative of the technology of information access and information provider apparatuses that the patent addresses -- that they are merely a preferred embodiment of the invention. (1:32-37, 4:24-29.)

13. This is underscored by the very cite that Dr. Almeroth's gives to support his argument "WWW sites (websites) are accessed through use of their domain names …" (1:54-55). This portion of the patent is referred to "WWW sites" and not to networking sites in general. The '106 patent encompasses both the Internet and WWW, as well as private networks using domain names *not* registered by a third party. In this regard, it is common for private networks to use domain names that are not "third-party approved" or registered. In my own local area network in my home office, each computer has a domain name by which it is referenced, but these names are not "WWW" names, nor are they "registered by a third-party" as may be the case on the Internet.

14. To further underscore the flawed logic in Dr. Almeroth's argument, consider that a number of dependent claims in the patent (e.g., claims 5 and 11) "specialize" the server access mechanism to the world-wide web (WWW) and the HTTP protocol, using URLs. Dr. Almeroth's

-4-

proposed construction, which limits domain names to registered Internet (i.e., WWW) domain names, would render much of this claim language superfluous. For example, limiting term "domain name" to a "registered Internet domain name" would effectively introduce concepts of the WWW, URLs and HTTP into broader claims, while rendering those terms meaningless in the narrower claims. This is consistent with the earlier statements in the patent cited above – that WWW, HTTP and the Internet are exemplary, as is the limitation that domains names be registered by a third-party.

15. There is nothing about the operation of the invention requiring the use of "third-party approved" or "registered" domain names. For example, the '106 patent explains that the server identification data can be retrieved using a conventional database that associates domain names with server identification data. ('106 patent at 7:56-8:4.) The database need not be maintained by a third party or use only registered domain names. Therefore, the invention can be deployed on any type of network and be used by any type of client to retrieve data regarding a server that can be accessed using any type of domain name.

16. Finally, NetApp's own manuals make it clear that use of the term "domain names" is not limited in the way Dr. Almeroth claims. NetApp, itself, regularly uses the term "domain name" to describe "a name that has a numerical IP address associated with it" and is not registered nor third party approved. For example, in documentation describing the accused products (e.g., Data ONTAP® 7.2), NetApp's own Network Administration guide explains that "domain names" can include things other than DNS domain names, such as NIS domain names, which need not be registered, nor third party approved. (See e.g., Data ONTAP® 7.2, Network Management Guide (March 2007) attached to Declaration of Carrie Williamson In Support Of Sun's Responsive Claim Construction Brief.) In fact, NetApp repeatedly uses the phrase "NIS domain name" throughout the Network Management Guide. (See e.g., pages 101, 103, 104, 105 and 107.) NetApp's use of the term "domain name" in a manner consistent with Sun's construction and contrary to its own construction further supports adopting Sun's construction.

17. Dr. Almeroth's reliance on the "Telnet" art also is misplaced. Dr. Almeroth's discussion of "Telnet" is superficial and certainly does not support a conclusion that all

-5-

limitations of any claim are anticipated. Thus, it is pointless to comment on it.

18. Insofar as his construction of "server identification" data is concerned, it is once again illustrative of his importing limitations from the specification into the claims. As discussed above with respect to the term "domain name," the '106 patent specification repeatedly explains that concepts such as the Internet, "WWW", "URLs" and "HTTP" are merely representative of the technology addressed by the invention, and describes the overall invention more broadly, to cover any type of networked client-server relationship. ('106 patent at 1:32-37; 4:24-29; 2:24-59.) The '106 specification describes the invention as a way of "providing server-specific information to a computer user." ('106 patent 2:24-33.) The server-specific information, called "sever identification data", is obtained using a domain name and can be displayed to a user using a display device. ('106 patent at 2:28-31.) The specification descries "server identification data" as including "descriptive information about a server." ('106 patent at 31-33.) Sun's proposed construction captures all of these features that are described as "the invention" of the '106 patent. That is, Sun's construction explains that the server identification data is "server-specific" and "descriptive" (i.e., "information that uniquely identifies one server from other servers") and can be displayed to a computer user (i.e., "information that ... can be seen by a user"). In contrast, NetApp's construction focuses not on what the patent describes as the "invention", but rather, only to excerpts describing the "preferred embodiment."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 21 day of July 2008.

DR. MARTIN E. KALISKI