Douglas R. Schwartz (State Bar #98666)
Scott R. Lovernick (State Bar #233755)
SCHWARTZ & CERA LLP
44 Montgomery Street, Suite 3850
San Francisco, California 94104
Telephone: (415) 956-2600
Facsimile: (415) 438-2655

Attorneys for
ORRICK, HERRINGTON & SUTCLIFFE LLP
Non-Party Respondent

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NETWORK APPLIANCE, INC., <br><br> Plaintiff-Counterclaim Defendant, <br><br> vs. <br><br> SUN MICROSYSTEMS, INC., <br><br> Defendant-Counterclaimant. | Case Number: 3:07-CV-06053 EDL (JCS) <br><br> **NON-PARTY RESPONDENT ORRICK HERRINGTON & SUTCLIFFE, LLP'S OPPOSITION TO SUN MICROSYSTEMS, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** <br><br> Date: August 12, 2008 <br> Time: 9:30 a.m. <br> Courtroom: E, 15th Floor <br> Hon. Elizabeth D. Laporte |

Pursuant to Northern District of California Local Rule 6-3(c), Orrick, Herrington & Sutcliffe, LLP ("Orrick") submits this Opposition to Sun Microsystems, Inc.'s ("Sun") Motion to Compel Production of Documents.

I.  **INTRODUCTION**

Sun's motion to compel should be denied. First, most of Sun's motion is moot as the requested relief was provided. The only issue remaining from Sun's motion is whether the Court should grant Sun's request to escape reimbursing Orrick fully for the reasonable outside copying

-1-

OHS WEST:260478342.3

costs Orrick incurred while responding to the subpoena (Sun has offered to pay only $8,402.19 of approximately $21,400 in copying costs). Sun's request should not only be denied, but Sun should now be ordered to reimburse Orrick for all of its costs, including attorneys fees and other costs, associated with responding to Sun's poorly crafted and excessively broad subpoena. As Sun's subpoena broadly requested Orrick to produce materials from its attorney's files relating to a long since concluded matter, Sun knew or should have known that properly responding to such a subpoena of client records would be expensive, problematic and complicated for any law firm. Moreover, Sun's bad faith in filing this motion instead of simply reimbursing Orrick for its reasonable outside copying vendor costs (*i.e.*, there is no profit margin for Orrick as the copying was done by a vendor and not Orrick) further justifies full reimbursement of Orrick's costs. Ultimately, Sun's conduct dragged Orrick into the messy underlying litigation; it should now be required to reimburse Orrick for all of the costs Orrick undeservedly incurred as a result.

Accordingly, Orrick respectfully requests that the Court deny Sun's motion in its entirety and award Orrick all of its reasonable costs incurred responding to Sun's subpoena.

## II. BACKGROUND

### A. The Third Party Subpoena Sun Served On Orrick Was Poorly Crafted And Specifically Sought Production of Privileged Materials in Orrick Files

Sun's subpoena sought the production from Orrick's client files of materials supposedly related to the formation of the plaintiff in the underlying case, Network Appliance, and presumably the technology that gave rise to the company. Back in approximately 1995 and 1996, Orrick represented Dr. Michael Malcolm, one of the founders of Network Appliance, in a trade secrets litigation in Santa Clara Superior Court - *The Whipsaw Group, et al., v. Network Appliance Corporation, etc, at al.*, Santa Clara Superior Court Case No. CV 742186, ("*Whipsaw* matter"). (Hult Decl., ¶4). Although any relevant, non-privileged documents from the *Whipsaw* matter would presumably be in the possession of Sun's party-opponent, Network Appliance, Sun decided instead

(or in addition) to subpoena Dr. Malcolm's old law firm, Orrick, for these very documents. (Exhibit A to the Corbett Declaration).

The Rule 45 subpoena Sun served on Orrick was extraordinarily overbroad, containing thirty-one (31) separate requests for documents. It was also poorly crafted (especially for a third-party subpoena served on a law firm), as it directly called for the production of privileged and other protected information. Request No. Ten (10) is illustrative as it sought the production of <u>all documents</u> "Related to the Whipsaw Litigation" in the files of four specific Orrick attorneys who worked on the Whipsaw matter and similar files of "any other attorney at Orrick."[1] Obviously, requests of this nature are not reasonably calculated to lead to the production of admissible evidence, especially when more specific and less invasive requests can be used. Fed. R. Civ. Proc. 26. The requests were further objectionable and improper as they had not been crafted in a manner that would minimize the impact on Orrick, a third party. Fed. R. Civ. Proc. 45. For example, the first ten requests sought "all documents" produced by parties and various non-parties alike in the *Whipsaw* matter. (Exhibit A to the Corbett Declaration).[2] Requests 11 through 14 were similarly excessive in scope as they sought "all documents" related to two separate patents. *Id.* The final requests, Requests 15 through 31, suffered the same over breadth problems, seeking "all documents" related to various individuals and entities, including the privileged files of Orrick attorneys, spanning all periods of time "before 1997." *Id.*

---

[1] Request No. Eight (8) is similarly poorly crafted, calling directly for the production of attorney client communication and work product: "All Documents concerning communications between You and any Person Relating to the Whipsaw Litigation."

[2] The *Whipsaw* matter was heavily litigated for approximately two years and involved multiple parties and third parties. The litigation generated numerous volumes of pleadings, correspondence and other documentation, much of that consisting of attorney work product or otherwise privileged material. (Hult Decl., ¶4).

**B.    Orrick Hires Outside Counsel to Handle Its Response To Sun's Overboard Subpoena**

After researching what materials were still in Orrick's possession that might be responsive to Sun's subpoena, Orrick learned that it still possessed in its off-site storage, the working files of the attorneys and staff who worked on the *Whipsaw* matter. (Hult Decl., ¶5). While Orrick realized that reviewing the off-site materials would be time consuming and burdensome, it had no interest in litigating to quash the subpoena. (Hult Decl., ¶6). At the same time, Orrick wanted to ensure that responding to Sun's subpoena would not distract its attorneys and staff from their client work. (Hult Decl., ¶6). Accordingly, Orrick hired a local firm, Schwartz & Cera LLP, to assist it with the review and response to Sun's subpoena. *Id.*

After retaining the Schwartz firm, Orrick paid $606 to retrieve approximately 120 boxes[3] from its off site storage. (Lovernick Decl., ¶8). Orrick's counsel reviewed these documents in April 2008 for responsiveness and privilege.[4] Because of the volume of materials, the condition of the materials and the complicated confidentially and privilege issues at play,[5] Orrick's outside counsel spent approximately one-hundred and thirty (130) hours conducting this initial review, assisted at times by two Orrick paralegals and two Orrick attorneys. (Lovernick Decl., ¶8). The boxes Orrick retrieved contained significant amounts of non-responsive materials, including materials from other

---

[3] Not all of these boxes were fully filled and as mentioned, not all of the materials in each box related to the *Whipsaw* litigation. (Lovernick Decl., ¶11).

[4] Because a tremendous amount of the requested material captured Orrick attorney work product and/or other privileged material, Orrick's counsel negotiated with Sun's counsel that a privilege log need not be created or produced. (Lovernick Decl., ¶12). Although Sun's counsel represented that Orrick would not have to log such materials as early as April 2008, Sun's counsel did not put this commitment in writing until June 4, 2008. (Lovernick Decl., ¶12, Ex. A).

[5] For instance, while Orrick represented Dr. Malcolm, Keker & Van Ness represented Network Appliance. To the extent the documents captured or reflected joint defense communications, those issues needed to be considered.

-4-
ORRICK'S OPPOSITION TO SUN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
CASE NO. 3:07-CV-06053 EDL (JCS)

cases, as well as significant amounts of attorney work product or privileged materials from the *Whipsaw* case. (Lovernick Decl., ¶11). Similarly and not unexpectedly, there was significant duplication given that many of the boxes retrieved represented the individual working files of the various attorneys working on the same matter. (Lovernick Decl., ¶11) Through the initial review, Orrick's counsel narrowed the materials down to approximately 63,000 pages - 53,012 pages of likely responsive material and 9,726 pages of materials that needed additional consideration. (Lovernick Decl., ¶13).

Only after its counsel had narrowed the potentially responsive documents down significantly, Orrick hired a vendor to copy these materials for final review and processing. Though Sun complains that this step was unnecessary, Motion at 5-6, Orrick believes that it was not only reasonable to do so but was the most expedient way to proceed and well within the lines of acceptable and reasonable practices. Creating a "control set" both expedited the review process and ensured that the potentially responsive documents were not misplaced or mishandled. (Lovernick Decl., ¶14; Dalton Decl., ¶4). In addition, because the documents were in poor condition and of varying levels of copy clarity, creating a control set ensured that the copies made were legible. (Lovernick Decl., ¶14; Dalton Decl., ¶4).[6] Finally, this "control set" could be processed much more easily for final production via any of several means, including electronically. Not surprisingly, given that these documents had spent ten-plus years in storage and were of varying copy quality, to create the "control set" the documents could not be simply dumped into an automatic copying machine. Instead Orrick's vendor needed to

---

[6] When dealing with documents in poor condition, Orrick generally (as it did here) creates a hard copy – rather than scan the documents – to ensure document integrity and to ensure that the copies are legible. (Dalton Decl., ¶4).

spend extra time and labor to make useful copies. The vendor charged approximately $.20 a page as well as labor and other costs to make these copies. (Lovernick Decl., ¶14, Ex. B).

Once the "control set" had been made, Orrick's outside counsel spent several additional hours conducting a final review of these documents. (Lovernick Decl., ¶15). Ultimately, 38,916 pages of materials from the 63,000 originally copied were identified for production. (Lovernick Decl., ¶15). The approximately 24,000 or so pages of documents culled from the "control set" were determined to be non-responsive, duplicative or privileged. (Lovernick Decl., ¶15).

Orrick then scanned and electronically Bates labeled the final set of materials for production to Sun. (Lovernick Decl., ¶17). Scanning and electronically labeling the documents again was the most cost efficient and expedient way to get the documents ready for production. Doing so was reasonable and well within accepted practice. It also provided two cost-saving benefits: first, scanning was less expensive and wasteful than copying a second production set; second, scanning made it easier and less-expensive to create subsequent production sets (as the DVD containing the scanned images could simply be copied for future distribution of the documents). (Lovernick Decl., ¶17).[7]

Orrick incurred other reasonable costs and fees in addition to the time Orrick's outside counsel spent reviewing documents. For instance, attorneys from the Schwartz & Cera law firm spent significant time addressing the confidentiality issues raised by Sun's subpoena. Essentially all of the non-privileged, responsive material from the Whipsaw case in Orrick's files were designated as

---

[7] For example, if Network Appliance requested a copy set of the production materials, Sun could presumably share these materials and the costs to create the materials with Network Appliance. The DVD also allows Orrick to maintain a production set which could be used to resolve any disputes that may arise between Sun and Network Appliances regarding what exactly Orrick produced in response to the subpoena.

confidential under the Protective Order in the Whipsaw case. Orrick was therefore required to obtain releases to comply with the governing protective order from the *Whipsaw* matter, including obtaining releases from all of the Whipsaw plaintiffs as well as Network Appliance. (Lovernick Decl., ¶5). Orrick's outside counsel spent several hours working with Sun's counsel, Network Appliance's counsel and Dr. Malcolm's counsel obtaining and negotiating releases under the relevant protective order. (Lovernick Decl., ¶6). Before consenting to production, Network Appliance demanded the opportunity to review the materials. To do so, counsel for Network Appliance came to Orrick's Menlo Park office and reviewed the documents Orrick intended to produce at Orrick's Menlo Park office. (Lovernick Decl., ¶7). An Orrick paralegal monitored this review to ensure that Orrick's document production remained intact. *Id.*

Now Orrick is incurring additional costs and fees responding to Sun's unnecessary motion. Had Sun simply reimbursed Orrick the $21,000 in outside copy vendor costs Orrick incurred (*i.e.*, no profit to Orrick), as it originally promised to do, none of this motion practice would have been necessary.

### C. Orrick's Efforts to Obtain Reasonable Compensation From Sun For Responding To The Subpoena

Orrick's counsel and Sun's counsel discussed and agreed early in this saga that Orrick would obtain reasonable compensation for responding to Sun's subpoena. Indeed, counsel for Sun initially agreed in late March 2008 that Sun would reimburse Orrick for copying costs incurred responding to the subpoena. (Lovernick Decl., ¶2). At the time, Orrick did not request to be compensated for its other costs, including outside counsel fees, Orrick paralegal time and other costs, that it would expend responding to Sun's subpoena.

Relying on Sun's agreement to reimburse Orrick's copying costs, counsel for Orrick authorized copying of the "control set." (Lovernick Decl., ¶3). Upon receiving the invoice for these copies, counsel for Orrick apprised Sun's counsel of the costs. At that time, counsel for Sun did not

-7-
ORRICK'S OPPOSITION TO SUN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
CASE NO. 3:07-CV-06053 EDL (JCS)

object to these costs. Instead, Sun's counsel thanked Orrick for its good faith efforts to timely respond to the subpoena. (Lovernick Decl., ¶4).

After finalizing the document set for production, counsel for Orrick had them scanned and bates labeled, again relying on Sun's commitment to reimburse Orrick for these costs. (Lovernick Decl., ¶17). Surprisingly, when Orrick notified Sun that the documents were ready for production and provided Sun with its vendor invoices (amounting to $21,402.52), Sun refused to pay the entirety of the copy costs. (Lovernick Decl., ¶18). Instead, Sun reneged on its earlier agreement and only offered to pay $8,402.19 - the amount Orrick's vendor charged for creating an electronic set of the documents.

In trying to resolve the ensuing dispute over copying costs, Orrick advised Sun that it had incurred substantially more costs in responding to Sun's overbroad and improper subpoena, that it in no way was seeking to profit from the subpoena and that if Sun didn't honor its agreement, Orrick would seek reimbursement of all of its costs. (Lovernick Decl., ¶19). Sun stuck to its position and refused to pay the promised costs. After the negotiations broke down, Sun filed this expedited motion (but only after failing to follow this Court's standing order requiring the parties to submit a two page letter before filing a discovery motion). (Lovernick Decl., ¶20).

The last thing Orrick wanted was for this dispute to escalate and for Orrick to incur more costs associated with Sun's subpoena. Producing the documents was never an issue. Orrick never sought to delay discovery or hold up the litigation. Just the opposite is the case. However, Sun's unreasonableness has forced the issue. The instant dispute relates solely to money owed for copy costs to an outside vendor, a dispute of approximately $14,000.00. Orrick produced a DVD containing the non-privileged, responsive documents and advised Sun that it would likely seek the full reimbursement of its costs in opposition to Sun's motion if Sun would not honor its agreement. (Lovernick Decl., ¶19). After the Court denied Sun's request for an expedited schedule, Orrick attempted on three separate occasions to meet and confer with Sun's counsel regarding the subpoena. (Hult Decl., ¶8). Sun finally returned Orrick's call mid-afternoon on July 22, 2008, after the opposition papers were essentially complete. (Hult Decl., ¶8).

### D. Sun's False Statements Regarding The Meet And Confer

In its motion, Sun mischaracterizes the meet and confer process (described above) and submitted a declaration with a number of false or misleading statements – statements that warrant correction. Examples include the following:

- Contrary to representations made in paragraph 7 of the Corbett Declaration, Orrick's counsel advised Sun on or about April 2, 2008 of the copy costs incurred as of that time. (Lovernick Decl., ¶4).

- Contrary to representations made in paragraph 3 of the Corbett Declaration, Orrick's counsel advised Sun that the copy costs for the production would range from .08-.22 cents per page for the initial copy (without a production number) depending on the condition of the document to be copied, not simply the .08-.09 asserted by Sun. (Lovernick Decl., ¶2).

- Sun raised no objections to either the quoted per copy cost or the April 2008 invoice at anytime prior to June 25, 2008. (Lovernick Decl., ¶¶ 2 & 4).

- At no time did Orrick's counsel represent that production would occur prior to payment in full. (Lovernick Decl., ¶9).

- The two invoices referred to in paragraph 9 of the Corbett declaration, both relate to documents determined to be responsive to the subpoena. (Lovernick Decl., ¶10).

Despite Sun's mischaracterization of the meet-and-confer process, Orrick still reached out to Sun to try to resolve this dispute after the Court's Order denying Sun's application for an expedited hearing. The Court's Order actually required that Orrick and Sun further meet and confer. *Id.* But as discussed above, Sun only returned the last of Orrick's phone calls the afternoon of July 22, 2008, and no acceptable compromise was reached. (Hult Decl., ¶8).

///
///
///
///

### III. SUN'S MOTION SHOULD BE DENIED AND SUN SHOULD BE ORDERED TO PAY THE ENTIRETY OF ORRICK'S COSTS TO RESPOND TO THE SUBPOENA

#### A. Sun's Motion Is Moot

As discussed above, Orrick already has produced the responsive, non-privileged documents from its old client files. Similarly, although Orrick is not required to provide a written confirmation describing what documents Orrick did not produce under Federal Rule of Civil Procedure 45 or pursuant to its agreement with Sun concerning privileged materials in Orrick's *Whipsaw*-related files, it has nonetheless described those materials in this opposition. *See* Section II.B, above. Because there is nothing left to compel, these portions of Sun's motion should be denied.

#### B. Orrick's Use Of An Outside Vendor Was Reasonable And It Should Be Awarded The Entirety Of Its Copying Costs

It is well-settled that non-parties, such as Orrick in this action, should not be forced to bear an unreasonable share of costs when responding to a subpoena. As the Ninth Circuit explained:

> Although party witnesses must generally bear the burden of discovery costs, the rationale for the general rule is inapplicable where the discovery demands are made on nonparties. Nonparty witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party.

*United States v. Columbia Broadcasting Sys. Inc.*, 666 F.2d 364, 371 (9th Cir. 1982); *see also* Fed. R. Civ. Proc. 45(c)(1) & 45(c)(2)B(ii); *Pacific Gas and Elec. Co. v. Lynch*, 2002 WL 32812098, *3 -4 (N.D.Cal. 2002) ("Under the current version of FRCP 45, <u>courts are required to condition compelled production by a non-party on the payment of at least some portion of costs of production</u> by the serving party.") (emphasis added).

Under these rules, the $21,402.52 Orrick spent in copying costs is reasonable and should be awarded. As explained in Section II.B, the initial "control set" both expedited the review process and ensured that the potentially responsive documents were not misplaced or mishandled. The control set also served the additional benefits of ensuring that the copies made were legible, and that subsequent copy sets (such as a copy set Sun provides to its real opponent, Network Appliance) could be made for little to no additional cost. Notably, the documents were copied in a manner consistent with how

-10-
ORRICK'S OPPOSITION TO SUN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
CASE NO. 3:07-CV-06053 EDL (JCS )

Orrick generally handles document productions for its own clients that is consistent with industry best practices. (Dalton Decl., ¶7). Finally, Sun's suggestion that Orrick would have incurred fewer copying costs if it had initially scanned the documents is simply wrong. As explained in Section II.B, Orrick's original documents had spent ten-plus years in storage and were of varying copy quality. They could not be simply dumped into an automatic copying machine, much less a scanner. The costs to create a scanned copy set of these original documents would therefore have been much more expensive than the $.13 a page that Orrick's vendor charged to scan the more manageable "control set." (Dalton Decl., ¶6). However, such hypothetical assumptions are not relevant as Orrick's copy charges are more than reasonable in this situation.

Indeed, the reasonableness of the requested fees is obvious when compared with the total costs Orrick incurred to respond to the subpoena. As explained immediately below and in Section II.B, the $21,402.52 in vendor fees represents a small fraction of Orrick's total costs - over $75,000 in outside counsel fees, $606 to retrieve the documents from storage, over $12,172.75 of its own paralegal time and Orrick attorney time. (Lovernick Decl., ¶8; Dalton Decl., ¶8). Moreover, there is no doubt that Sun knew or should have known that responding to its subpoena would be significantly complicated and expensive given that the subpoena broadly asked for all materials in the files of Orrick's attorneys who worked on the *Whipsaw* matter.

At a minimum, Orrick is entitled to its copying costs under Rule 45.

### C.   Orrick Should Be Reimbursed For The Remainder Of Its Costs

Orrick should also be reimbursed for the remainder of the costs it incurred responding to Sun's subpoena. In similar disputes, the Northern District has generally provided that a non-party, such as Orrick, should be entitled to reimbursement for more than just its copying costs. For example, in *Pacific Gas and Elec. Co. v. Lynch*, 2002 WL 32812098, *3 (N.D.Cal. 2002), Judge Walker held that reimbursement should include not only copy costs, but also some portion of additional costs incurred, including attorneys fees where appropriate.

> PG & E indicates its willingness to pay "reasonable photocopying costs and shipping charges," but the cost of compliance with the subpoena by

-11-
ORRICK'S OPPOSITION TO SUN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
CASE NO. 3:07-CV-06053 EDL (JCS)

> BWG extends well beyond these costs. Labor costs involved in production must also be borne, to some extent, by PG & E. Moreover, legal work done to facilitate compliance may also be "considered a cost of compliance reimbursable under FRCP 45(c)(2)(B).

*Id.* There, Judge Walker awarded the responding non-party with the first $20,000.00 in fees it incurred, and ordered the parties to return to the Court if the costs to respond to the subpoena exceeded this number. *Id.*

Under Rule 45(c)(2)(B)(ii), the Court's order on a motion to compel must protect a non-party, such as Orrick, from "significant expense resulting from compliance" with the subpoena.[8] In practice, Courts have routinely awarded non-parties not only full copying costs, but lost paralegal time and at times attorney fees, to provide a non-party the protection that Rule 45 affords them. Each of these costs should be awarded here. It is pursuant to Rule 45(c)(2)(B)(ii) that Orrick now seeks its full costs, except for in-house attorney time, which it is willing to absorb.[9]

First, Orrick's lost paralegal time should be awarded. *Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 163 F.R.D. 329, 339 (N.D.Cal. 1995) illustrates this point. In *Compaq*, Judge Infante held that under Rule 45, a third party responding to a subpoena "is entitled to be compensated at a reasonable hourly rate for its employees', including in-house paralegals', time in searching for, reviewing for privileged material and producing responsive documents, and in sitting for deposition." Here, as established above, Orrick paralegals dedicated nearly 60 hours – or $12,172.75 in lost billings – working on Orrick's response to Sun's poorly crafted and over broad subpoena. (Dalton Decl., ¶8). Accordingly, $12,172.75 should be awarded to Orrick. *Id.*

---

[8] Likewise, under Rule 45(c)(1), the Court must ensure that the party responsible for issuing a subpoena "avoid[s] imposing undue burden or expense on the person subject to the subpoena." Fed. R. Civ. Proc. 45(c)(1). If a party imposes undue burden or expense, the Court must "impose an appropriate sanction – which may include lost earnings and reasonable attorney's fees – on a party or attorney who fails to comply" with this duty. *Id.* Subpoenaing a law firm for privileged materials is inherently wrong and likely to cause an undue burden on the law firm.

[9] The Court, in its discretion, may also reimburse Orrick these costs under Rule 45(c)(1) or Rule 26(c).

Likewise, Orrick should be reimbursed the $606 it incurred to retrieve the requested documents from storage. Sun knew or should have known that retrieval fees would be associated with recalling decade-old documents from storage. Because Orrick has established that it has incurred these fees to respond to Sun's subpoena, they should also be awarded.

Finally, Orrick should be awarded the approximately $75,000 in outside counsel fees it incurred in responding to Sun's subpoena to date. In *Columbia Broadcasting*, the Ninth Circuit held that a non-party should be reimbursed for some portion of $2.3 million in costs and attorneys' fees incurred in responding to subpoena, but remanded to the trial court to determine the reasonable amount of reimbursement. *Columbia Broadcasting*, 666 F.2d 364, 371 (9th Cir. 1982). In reaching this holding, the Court noted that several factors should be weighed when determining the extent to which a non-party should be reimbursed for attorney's fees, including (1) the scope of the discovery; (2) the invasiveness of the request; (3) the extent to which the producing party must separate responsive information from privileged or irrelevant material; and (4) the reasonableness of the costs of production. *Id.* at n. 9.[10] Here, each of these factors weighs in favor of awarding Orrick the entirety of its outside counsel fees.

The first factor – the scope of discovery – is clearly in Orrick's favor. As explained in Section II.A, the subpoena was incredibly overbroad, consisting of thirty-one (31) separate requests that directly and repeatedly sought production of privileged materials. The requests repeatedly covered "all documents" produced by parties and various non-parties alike in the *Whipsaw* matter, as well as "all documents" related to various individuals and entities. It is difficult to imagine a broader subpoena being issued by one international law firm to another.

There is no question that the second factor – the invasiveness of the request – also favors treating the attorney fees as reimbursable costs. Here, Sun directly subpoenaed a law firm for all

---

[10] The Court noted that it did not view these factors "as inflexible or exclusive," and would at times consider other factors, such as whether the responding party has an interest in the litigation (which Orrick does not have here). *Id.*

-13-

records, including attorney files, relating to a old matter. It is hard to imagine a more invasive request. Similarly, there is again no question that the third factor – the extent to which the producing party must separate responsive information from privileged or irrelevant material – also favors Orrick. Sun's document requests directly and repeatedly sought production of privileged materials from Orrick's attorney's files. The impact of such a poorly crafted request was unavoidable - Orrick was obviously forced to review massive amounts of privileged documents. Given that most of the responsive, non-privileged records Sun sought were most likely in the possession of its opponent, Network Appliance, Sun's subpoena is even more egregious.

The last factor – the reasonableness of the costs of production – also favors including the attorney fees as reimbursable costs. As explained above, responding to Sun's subpoena was not easy given the volume of material Orrick was required to review, the privileged nature of much of this material, the multiple parties in the underlying action, and ensuring compliance with the underlying Protective Order. The path Orrick took in responding to Sun's subpoena was measured and reasonable, and until Sun reneged on its agreement to pay Orrick's copying cost, non-confrontational.

Under these circumstances, an award of attorneys fees is appropriate, Sun should be required to pay the majority of costs[11] Orrick incurred responding to Sun's subpoena. Orrick bent over backwards to comply with Sun's ill-crafted demands. Orrick made every effort to comply with the demands as quickly as it could and has done everything possible to avoid a contentious fight over Sun's subpoena. Orrick expended substantial time and costs to respond in this manner – it hired outside counsel (as well as used its own paralegals and attorneys) to facilitate the review process and incurred nearly $100,000.00 in costs. Until Sun refused to pay Orrick's copy charges, Orrick was willing, for better or worse, to not seek reimbursement of the majority of these costs. All this has changed in light of Sun's unreasonable change of position and its filing of this baseless motion.

---

[11] Orrick is not seeking reimbursement for the attorney time spent by Orrick's in-house attorneys because it is seeking reimbursement for its outside counsel's time. Orrick's reimbursement request includes costs incurred responding to Sun's *ex parte* application to shorten time as well as all those associated with this opposition.

-14-
ORRICK'S OPPOSITION TO SUN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
CASE NO. 3:07-CV-06053 EDL (JCS )

Indeed, up until the moment Orrick requested full reimbursement of its copy charges, Orrick had received assurances from Sun that reimbursement would not be contested. With Sun's refusal to reimburse and subsequent take-it-or-leave-it offer, Orrick has been pushed too far. The Ninth Circuit law is clearly in Orrick's favor. Sun should be ordered to reimburse Orrick for the costs it was forced to incur to respond to Sun's poorly crafted and overly broad subpoena.

## IV.   CONCLUSION

For the foregoing reasons, Sun's motion should be denied, and Orrick should be awarded: (1) the entirety of the $21,402.52 in vendor costs it incurred to respond to Sun's subpoena; (2) $12,172.75 in lost paralegal time; (3) $606.00 to retrieve the documents from storage, and (4) $75,000.00 in outside counsel fees. A proposed order is submitted herewith.

Date: July 22, 2008                    SCHWARTZ & CERA, LLP


                                       _____/s/_____
                                       Douglas R. Schwartz
                                       Scott R. Lovernick
                                       Attorneys for Non-Party Respondent
                                       ORRICK, HERRINGTON & SUTCLIFFE, LLP