1   MATTHEW D. POWERS (Bar No. 104795)
    E-Mail:  matthew.powers@weil.com
2   EDWARD R. REINES (Bar No. 135960)
    E-Mail:  edward.reines@weil.com
3   JEFFREY G. HOMRIG (Bar No. 215890)
    E-Mail:  jeffrey.homrig@weil.com
4   JILL J. HO (Bar No. 236349)
    E-Mail:  jill.ho@weil.com
5   WEIL, GOTSHAL & MANGES LLP
    Silicon Valley Office
6   201 Redwood Shores Parkway
    Redwood Shores, CA  94065
7   Telephone: (650) 802-3000
    Facsimile: (650) 802-3100
8
    Attorneys for Plaintiff-Counterclaim Defendant
9   NETAPP, INC.

10                          UNITED STATES DISTRICT COURT

11                        NORTHERN DISTRICT OF CALIFORNIA

12                            SAN FRANCISCO DIVISION

13

14   NETWORK APPLIANCE, INC.,                     Case No. C-07-06053 EDL

15            Plaintiff-Counterclaim Defendant,   **NETAPP, INC.'S REPLY TO SUN
                                                  MICROSYSTEMS, INC.'S
16        v.                                      RESPONSIVE CLAIM
                                                  CONSTRUCTION BRIEF**
17   SUN MICROSYSTEMS, INC.,

18            Defendant-Counterclaim Plaintiff.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................... 1

II.  ARGUMENT ............................................................................................................. 1

A. U.S. Patent No. 5,925,106 ........................................................................................... 1

    1. **"Domain Name"  (Claims 1, 9, 14, 22, 27, and 35)** ........................................ 2

        a.  Sun's "Preferred Embodiment" Argument Is Misdirected ........................ 2

        b.  Sun Misapplies The Doctrine Of Claim Differentiation ............................ 2

        c.  Sun Ignores The Meaning Of "Domain Name" As Expressed In
           The Specification And The File History ..................................................... 3

    2. **"Server Identification Data"  (Claims 1, 4, 9-10, 14, 17-18, 23-24, 27, 30, 35-36)** ........................................................................................................... 3

        a.   NetApp's Construction Is Supported By The Intrinsic Evidence ............. 4

        b.   Sun's Attempt To Cure Its Overreaching Construction Is Ineffective ....... 5

B. U.S. Patent No. 5,459,857 ........................................................................................... 6

    1. **"Responsive to Writing..." / "Responsive to Receipt..." (Claims 6 and 11)** ........... 6

        a.  NetApp's Construction Gives Effect To The Plain Meaning Of The
           Claims As Written; Sun's Construction Simply Rewrites Them ............... 6

        b.  Sun's Purported Justification Is Wrong As A Matter Of Law ................... 8

        c.  Sun's Construction Selectively Ignores The Intrinsic Evidence And
           Redefines Specification Terms While Improperly Picking And
           Choosing Limitations To Import .............................................................. 9

C. U.S. Patent No. 5,749,095 ......................................................................................... 13

    1. **"Completing [a] Write Operation…"  (Claims 1, 11, and 17)** .......................... 13

        a.  Sun's Argument That The Claims Are "Clear On [Their] Face To
           [A] Person Of Ordinary Skill In The Art" Is Irrelevant ........................... 13

        b.  The "Provided To Subsequent Read Operations . . . To The Same
           Address" Requirement of Sun's Alternative Construction Lacks
           Support In Either The Claim Language Or The Specification Of
           The '095 Patent ...................................................................................... 14

        c.  The "Is Or Will Be Coherent" Requirement Of Sun's Alternative
           Construction Is Unsupportable ............................................................... 15

        d.  Sun's Criticism Of NetApp's Proposed Construction Is Logically
           Flawed .................................................................................................... 15

        e.  Sun Misapplies The "Rules of Claim Construction" ............................... 16

D. U.S. Patent No. 6,873,630 ......................................................................................... 17

    1. **"Portion" / "Element"  (Claims 3, 5, 8, 13-15, 21-23, 45-48, 50, 52, 73, 76, 79, 89, 113, 114, 116, 117)** ............................................................................ 17

        a.  The Claim Terms Require Construction ................................................. 17

        b.  The '630 Patent Claims Should Be Limited To Data Striping Below
           The MAC Layer ..................................................................................... 18

1

**TABLE OF CONTENTS**
(continued)

2
                                                                                                   **Page**

3          c.      Sun's Claim Differentiation Arguments Fail ............................................. 21

4    III.    CONCLUSION ........................................................................................................... 23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2
**Page**

3
**FEDERAL CASES**

4
*Andersen Corp. v. Fiber Composites, LLC,*
    474 F.3d 1361, 1370 (Fed. Cir. 2007)..................................................................................16

5

*Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,*
6
    98 F.3d 1563 (Fed. Cir. 1996)............................................................................................... 5

7
*AstraZeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharmaceutical Co. Inc.,*
    384 F.3d 1333 (Fed. Cir. 2004)............................................................................................19

8

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
9
    922 F.2d 792 (Fed Cir. 1990)................................................................................................ 6

10
*CVI/Beta Ventures, Inc. v. Tura LP,*
    112 F.3d 1146 (Fed. Cir. 1997)............................................................................................. 4

11

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
12
    438 F.3d 1374 (Fed. Cir. 2006)....................................................................................16, 21

13
*Helmsderfer v. Bobrick Washroom Equipment, Inc.,*
    527 F.3d 1379 (Fed. Cir. 2008)............................................................................................. 8

14

*Karlin Technology Inc. v. Surgical Dynamics, Inc.,*
15
    177 F.3d 968 (Fed. Cir. 1999)............................................................................................... 4

16
*O2 Micro International Ltd. v. Beyond Innovation Technology Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................................17-18

17

*On Demand Machine Corp. v. Ingram Industrial Inc.,*
18
    442 F.3d 1331 (Fed. Cir. 2006).....................................................................................19, 20

19
*Ormco Corp. v. Align Technology, Inc.,*
    498 F.3d 1307, 1316 (Fed. Cir. 2007)................................................................................... 4

20

*Phillips v. AWH Corp.,*
21
    415 F.3d 1303 (Fed. Cir. 2005)....................................................................... 4, 5, 6, 13, 14

22
*SRAM Corp. v. AD-II Engineering, Inc.,*
    465 F.3d 1351 (Fed. Cir. 2006)............................................................................................. 7

23

*Sinorgchem Co. Shandong v. International Trade Commission,*
24
    511 F.3d 1132 (Fed. Cir. 2008)............................................................................................16

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## INTRODUCTION

As demonstrated below, Sun has failed to present any compelling reason why NetApp's proposed constructions for United States Patent Nos. 5,925,106 ("the '106 patent"), 5,459,857 ("the '857 patent"), 5,749,095 ("the '095 patent"), and 6,873,630 ("the '630 patent") should not be adopted by the Court.

# II.

## ARGUMENT

### A.     U.S. PATENT NO. 5,925,106

As illustrated by the parties' opening and responsive briefs, the fundamental dispute with respect to the '106 patent is whether the claim terms should be construed to approximate what was purportedly invented or broadened beyond what the named inventors represented to the public and the Patent Office as their invention.  NetApp's proposed constructions should be adopted because they stay true to the nature of the alleged invention, which, as described by the inventors themselves, is narrowly aimed at helping inexperienced users of the Internet so they do not become disoriented when viewing websites bearing either non-descriptive or mis-descriptive domain names.  Walter Decl. Exh. A at 1:58-2:3.[1]

Sun contends, on the other hand, that it is entitled to an exceedingly broad reading of its claims.  For example, Sun argues that "the invention can be used on *any* type of network and by *any* type of client to retrieve information about a server accessed through *any* type of domain name."  *See* Sun's Responsive Cl. Constr. Br. [hereinafter "Sun Opp."] at 4.  But this aggressive contention is overreaching, as Sun's brief itself acknowledges.  Indeed, Sun concedes that it "has no objection to the Court stating in its claim construction order that an IP address does not itself constitute either limitation" (i.e., "server identification data" or "descriptive information about a server") and likewise "does not object to the Court stating in its claim construction order

---

[1]  All references to "Walter Decl." in this brief refer to the Declaration of Derek C. Walter in Support of NetApp's Opening Claim Construction Brief, filed on July 8, 2008.  Likewise, references to NetApp's expert declarations refer to those filed with the opening brief.

that the domain name, hypertext links, URLs, web page titles and bookmarks do not by themselves satisfy" those same limitations. *Id.* at 12, 13. Sun's effort to preserve its proposed constructions by carving out what it expressly disclaimed during prosecution results in unworkable constructions that continue to depart from the true nature of the purported invention, and should be rejected.

### 1. "Domain Name" (Claims 1, 9, 14, 22, 27, and 35)

| Term | NetApp's Construction | Sun's Construction |
|------|----------------------|--------------------|
| "domain name" | A third-party-approved name of a website on the Internet, i.e. a registered domain name. | A name that has a numerical IP address associated with it. |

#### a. Sun's "Preferred Embodiment" Argument Is Misdirected

Sun makes much of the fact that the '106 patent merely describes a "preferred embodiment utilizing WWW browser and WWW server applications." Walter Decl. Exh. A at 1:36-37; *see* Sun Opp. 3-6. This misses the point. NetApp is not asking the Court to construe "network" – a different claim term – to exclude private networks. Of course, it would be illogical to implement the invention in a private network of a company, where the owner of the server(s) is known to be the company itself, because the intended purpose of the purported invention is to assist inexperienced users of the Internet in identifying the server of a viewed web page. But even if it were so used, the claims of the '106 patent would require that a "domain name" be used to obtain "server identification data," i.e., a registered *domain name* as opposed to an unregistered name on a local or private network.

#### b. Sun Misapplies The Doctrine Of Claim Differentiation

Sun's claim differentiation arguments should be accorded no weight. The adoption of NetApp's proposed construction of "domain name" would not result in the '106 patent reciting two claims with identical scope.

Instead, Sun argues that the invention should not be limited to the use of WWW, URLs and HTTP because those limitations are added by various dependent claims. Yet, the Internet is broader than the World Wide Web, *see generally Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 849-53 (1997), and encompasses other public network applications existing at the

time the '106 patent was filed, such as Telnet. See Almeroth Decl. at 10. Thus, understanding that the independent claims of the '106 patent require the use of registered domain names would not render them identical in scope to dependent claims that further recite WWW, URLs or HTTP.

### c. Sun Ignores The Meaning Of "Domain Name" As Expressed In The Specification And The File History

As understood by a person of skill in the art, a "domain name" in the context of the '106 patent is a third-party-approved name of a website on the Internet, i.e., a registered domain name. *See* Almeroth Decl. at 5-9. The specification itself confirms that "[d]omain names are requested by the maintainers of the website and are approved by a third party." Walter Decl. Exh. A at 1:56-57. The specification also incorporates by reference various Internet standards documents that describe domain names as being registered with a third-party Internet domain name registry. *Id.* at 1:27-44; *see also* NetApp's Opening Cl. Constr. Br. at 6 n.2.

Likewise, during prosecution, the patentee expressly stated that "[t]he 'Domain Name' term is used in accordance with standard usage in the field." Walter Decl. Exh. E. at 6. As NetApp pointed out in its opening brief, the patentee even distinguished domain names from the additional information about the server that is retrieved on the basis that the latter, unlike domain names, "need not be unique nor approved by a third party." *Id.* at 7. This intrinsic evidence combined with all the extrinsic evidence presented by *both* sides strongly support adoption of NetApp's proposed construction.[2]

### 2. "Server Identification Data"  (Claims 1, 4, 9-10, 14, 17-18, 23-24, 27, 30, 35-36)

| Term | NetApp's Construction | Sun's Construction |
|---|---|---|
| "server identification data" | Human-friendly information identifying a specific web server designed not to be intimidating to inexperienced users of the World Wide Web. | Information that uniquely identifies one server from other servers and can be seen by a user. |

Sun's proposed construction of "server identification data" is similarly strained. Sun argues for a broad interpretation, yet backtracks in the same breath, conceding that it would

---

[2] Sun points to NetApp's use of the phrase "NIS domain name" in its manuals, *see* Sun Opp. at 8, but the use of this phrase as opposed to "domain name" by itself, further confirms that "domain name" has a standard meaning from which "NIS domain name" needed to be distinguished.

1    have "no objection" to the Court limiting its construction to avoid reading on prior art and "moot"

2    NetApp's argument.  *See* Sun Opp. 12-13.  Sun cannot have it both ways.

3                              **a.    NetApp's Construction Is Supported By The Intrinsic Evidence**

4                    Sun summarily argues that there is no basis for importing the limitations "human-

5    friendly" and "designed not to be intimidating."  Sun Opp. at 10.  But it cannot – and, indeed,

6    does not attempt to – reconcile its position with the stated goal of the invention:  to assist

7    inexperienced users of the Internet in identifying the origin of a website by "presenting *human-*

8    *friendly* server identification information to a user."  *See* Walter Decl. Exh. A at 1:16-17.[3]

9    Indeed, during prosecution, the patentee reiterated that the invention was intended to solve the

10   problem of users being confronted with "non- or  mis-descriptive server domain names by

11   presenting server-specific descriptive information to the user that identifies and/or describes the

12   server."  *See* Walter Decl. Exh. E at 8.  The narrow goal of the patent is significant because it is

13   well-established that "the problem the inventor was attempting to solve, as discerned from the

14   specification and the prosecution history, is a relevant consideration" in claim construction.

15   *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997).

16                    The sole purpose of the '106 patent is to assist novice users of the Internet (or

17   more specifically, to help inexperienced individuals navigating websites on the World Wide

18   Web).  Against that backdrop, "server identification data" must (1) be human-friendly; (2) not be

19   intimidating to an inexperienced user; and (3) identify the server hosting the viewed website*.  See*

20   *Ormco Corp. v. Align Technology, Inc.,* 498 F.3d 1307, 1316 (Fed. Cir. 2007) ("Accordingly, to

21   attribute to the claims a meaning broader than any indicated in the patents and their prosecution

22   history would be to ignore the totality of the facts of the case and exalt slogans over real

23   meaning.").  While there is admittedly a high bar for limiting the scope of the patent to what the

24   patentee says is "the present invention," *see Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177

25   F.3d 968, 973 (Fed. Cir. 1999), here that standard is met because the alleged improvement over

26   the prior art was minimal, at best.  Indeed, the only disclosed embodiment accomplishes the goal

27   of assisting disoriented novices of the Internet by simply adding the name of the website owner in

28   ───────────────
[3] Emphasis added throughout unless otherwise noted.

parentheses next to the URL.  *Compare* Walter Decl. Exh. A Figs. 3B & 3C; *see also id.* at 2:11-16.

Moreover, viewing the claims in the context of the state of the art at the time the '106 patent was filed confirms that "server identification data" requires something more than the previously known means of uniquely identifying a server, such as IP addresses.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1333 (Fed. Cir. 2005) (noting that the differences between the claims and the prior art should be ascertained "to better define what the inventor holds out as the invention"); *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1573 (Fed. Cir. 1996) (affirming the district court's construction that "correctly placed the term 'cold purge process' in the context of the state of the art when the '389 invention was made").  Here, the specification explains that domain names are often "not descriptive or misdescriptive of the site" and "IP addresses carry no descriptive value whatsoever."  Walter Decl. Exh. A at 1:60-64.  The patentee also expressly stated during prosecution that "an IP address that is returned by a name server" would fail to qualify as "server identification information."  Walter Decl. Exh. E at 6.  As explained in NetApp's opening brief, the type of information provided to identify the server must therefore be ***more*** descriptive to an inexperienced user of the Internet than an IP address.

Finally, although Sun argues that the phrases "human friendly" and "designed not to be intimidating" would fail to provide guidance to a jury, this is untrue.  Indeed, a jury is fully capable of determining what types of server-identifying information would be intimidating to a layperson.

### b.    Sun's Attempt To Cure Its Overreaching Construction Is Ineffective

Sun's responsive brief fails to address the fact that Sun's proposed construction of "server identification data" would encompass even an IP address, which was expressly disclaimed by the patentee, because it uniquely identifies one server from another server and can be seen by a user.  Instead, Sun attempts to "moot" NetApp's argument by inviting the Court to carve out from its proposed definition various types of data (not just IP addresses) that would read on prior art.  This is exactly the type of judicial redrafting of claims that is not permitted.  *See generally*

*Phillips*, 415 F.3d at 1327; *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 & n.6 (Fed Cir. 1990). Not only does this intricate attempt to draft around the inventors' admissions during prosecution result in an unworkable construction, it is wholly unnecessary if the Court stays true to the nature of the purported invention, as understood by those of ordinary skill in the art and the inventors themselves. Because it reflects this understanding, NetApp's construction should be adopted.

### B.    U.S. PATENT NO. 5,459,857

NetApp's proposed constructions track the plain meaning of the disputed claim language. In stark contrast, Sun asks the Court to rewrite the asserted claims by importing limitations selectively from the specification. Sun offers but one justification for this aggressive position: that the '857 patent discloses only one embodiment, and that the asserted claims would not cover this embodiment under NetApp's construction. But this sole justification is both factually and legally deficient, and in no way warrants rewriting the plain language of the claims. As a result, the Court should adopt NetApp's proposed constructions.

### 1.    "Responsive to Writing..." / "Responsive to Receipt..."  (Claims 6 and 11)

| Term | NetApp's Construction | Sun's Construction |
|---|---|---|
| "In response to writing a data record to said one redundancy group" / "Responsive to writing a data record to one of said redundancy groups" | After and in reaction to the writing of a data record to a single redundancy group. | In response to writing the data record to memory associated with the one redundancy group. / Responsive to writing the data record to memory associated with one of the redundancy groups. |
| "In response to the receipt of a stream of data records from said data processor" / "Responsive to the receipt of a stream of data records from said data processor" | After and in reaction to the receipt of data records from a processor. | Sun contends this phrase does not require construction because the phrase is clear on its face. |

### a.    NetApp's Construction Gives Effect To The Plain Meaning Of The Claims As Written; Sun's Construction Simply Rewrites Them

NetApp's construction gives effect to the plain language of the claims which, as NetApp showed in its opening brief, requires that transmitting of data records occur only after

1   writing them, and that selecting space to write them occur only after they have been received.  In

2   contrast, rather than clarify or interpret the meaning of the words in the claims, Sun simply adds

3   new words.  Indeed, as it admits freely, Sun would have the Court rewrite the asserted claims by

4   replacing the words "redundancy group" with the words "memory associated with a redundancy

5   group."

6       transmitting, in response to writing a data record to **memory associated with**
        said one redundancy group, said written data record to the other of said data
7       storage subsystems…

8

9   Walter Decl. Exh. B at 14:12-14 (Sun's proposed modifications supplied).

10              The "memory associated with" a redundancy group that Sun argues should be

11  added to the claim is cache memory.  *See* Sun Opp. at 17.  This is significant, because the cache

12  memory is completely separate from, and performs a different function than, the redundancy

13  group.  By replacing the requirement that the data record be written to the redundancy group with

14  the proposed requirement that the data record be written to the cache memory, Sun changes the

15  order of steps required under the claims.  The plain language of the claims requires the data

16  records to be transmitted to the second storage system *after* they are written to the single

17  redundancy group.  But, under Sun's construction, data records can be transmitted *before* they are

18  written.  *See* Sun Opp**.** at 20.  As a result, another way of illustrating Sun's proposed change is by

19  deleting the words "in response to" from the claim:

20      transmitting, ~~in response to~~ writing a data record to said one redundancy
        group, said written data record to the other of said data storage subsystems…
21
    Walter Decl. Exh. B at 14:12-14 (Sun's proposed modifications supplied).
22
23              This result is improper.  Put simply, courts do not rewrite claims.  *See, e.g.*, *SRAM*

    *Corp. v. AD-II Engineering, Inc.*,  465 F.3d 1351, 1359 (Fed. Cir. 2006)(explaining that courts,
24
    "are powerless to rewrite the claims and must construe the language of the claim at issue based on
25
    the words used.")(citations omitted).  NetApp's constructions should be adopted because they
26
    give full effect to the plain language of the claims as written.
27

28

1    **b.    Sun's Purported Justification Is Wrong As A Matter Of Law**

2    Sun's sole argument in support of its request to have its claims rewritten hinges on

3    the premise that every single claim of the '857 patent must somehow cover the "sole

4    embodiment" allegedly disclosed in the specification.   Sun argues that, "[t]he '857 patent

5    describes a single embodiment for writing duplicate data records through the data storage

6    subsystem," and refers to the "preferred ***and only embodiment***," or similar phrases no fewer than

7    *eight* times throughout its brief.  Sun Opp. at 14, 17-19.

8

9    The rule Sun wishes to invoke is far more nuanced.  It is designed to reflect the

10   common sense observation that a patent drafter would not generally draft a set of claims such that

11   *none* of the claims would cover the preferred or only embodiment disclosed in the specification.

12   But this rule, such as it is, cannot be woodenly applied to every situation.  In fact, there is simply

13   no requirement that every single claim of a patent cover a preferred embodiment, whether or not

14   it is the only embodiment.  Indeed, Sun points to no such rule.

15

16   Where the set of *claims* as a whole covers the single embodiment, there can be no

17   dispute that it is permissible for certain claims to exclude it.  *See Helmsderfer v. Bobrick*

18   *Washroom Equipment, Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("It is often the case that

19   different claims are directed to and cover different disclosed embodiments.").  *Helmsderfer* dealt

20   with a construction that did "not cover the preferred embodiment *or* the other illustrated

21   embodiments."  *See*, *id.* at 1383.  The Court went on to explain that, "this does not mean that

22   these embodiments are all excluded from the scope of the invention, *but rather that they are*

23   *excluded from the scope of these particular claims*."  *Id.*

24

25   Thus, the law recognized that where a specification discloses one embodiment, and

26   that embodiment is covered by certain claims, the drafter may elect to include additional claims

27   that *do not* cover it.  And, taking Sun's factual assertions at face value, that is precisely the

28

situation here.[4]  For example, dependent claim 26 actually requires the use of a cache memory, the very element that Sun's argument would require the court to read into all the claims of the patent.  *See* Walter Decl. Exh B at 18:28-45 (claiming, "The data storage system of claim **24** wherein each of said data storage controls contains a *cache memory*…").  Likewise, claim 24 is drafted in a manner fully consistent with the order asserted by Sun to be the preferred embodiment, reciting first a means for transmitting, and next a means for writing.  *See* Walter Decl. Exh B at 7:55-18:23.  In sum, Sun's argument is simply wrong as a matter of law.

> **c.    Sun's Construction Selectively Ignores The Intrinsic Evidence And Redefines Specification Terms While Improperly Picking And Choosing Limitations To Import**

In addition to advocating a rewrite of the actual claim language, Sun's position is internally inconsistent.  Although it purports to modify the claim language to match the disclosure, Sun's construction would redefine terms already defined in the specification, such as "cache memory," and "redundancy group."

Sun's construction equates writing to a cache memory with writing to a redundancy group, reasoning that, because a cache memory is "associated with the redundancy group," – a vague statement that could mean anything – writing a data record to one redundancy group is satisfied by writing a data record to a cache.  *See, e.g.*, Sun Opp. at 17 (explaining that, "cache memory… is associated with the redundancy group.").  This argument is at odds with the evidence from the specification, which defines a redundancy group as follows: "A redundancy group consists of N+M *disk drives*.  The redundancy group is also called a logical volume or a

---

[4] Contrary to Sun's assertions, it is not at all clear that the specification requires one and only one order of transmitting and writing.  At 4:39-54, an order of data record write operations is disclosed, without any *mention* of transmitting data to the redundant storage control unit.  *See* Walter Decl. Exh. B.  In addition, as discussed below, *infra*, at 11-12, the passage Sun cites for the "one and only" order of performed steps, actually discloses a *different* order from that in the figure it purportedly describes.  These facts show that there is not a single embodiment in the '857 patent, and that if there is one, it does not require one strict ordering of the steps of a data record write operation.  Sun's reliance on a single passage from 11:12-12:9 of the '857 patent is therefore misleading, because it purports to show a single possible embodiment where at best it is merely an option disclosed in more detail than other contemplated options.  On these facts, the idea that every claim should cover exactly what the preferred embodiment supposedly discloses, is simply wrong.

1   logical device." Walter Decl. Exh. B at 7:18-20.[5]  Thus, not only does the patent define

2   redundancy group to mean disks and not cache memory, but it even goes so far as to name two

3   other things redundancy groups might be called.  If the patentees had meant to equate cache with

4   redundancy group they should have written, "The redundancy group is also called a cache

5   memory." They wrote no such thing.

6          In addition, the cache memory is defined as a part of the storage control unit and

7   not as a part of the redundancy groups.  *See, e.g.*, *id.* at Fig. 2 (showing the cache 512 as part of

8   the storage control unit 105, which is separate from the redundancy groups also shown in the

9   same figure).  The distinction between redundancy group and cache is made extremely clear in

10  the following passage from the specification: "No data stored in a redundancy group is modified.

11  A virtual track is staged from a redundancy group into cache.  The host then modifies some,

12  perhaps all of the records on the virtual track.  Then… the modified virtual track is selected to be

13  destaged to a redundancy group."  *Id.* at 3:65-4:4.  It is therefore essential to the way the

14  purported invention functions that the cache and the redundancy group *not* be the same thing, and

15  that therefore writing to the one is *not* the same as writing to the other.

16         Moreover the same passages Sun cites to support this conflation of cache memory

17  and the redundancy group demonstrate that writing to cache and writing to redundancy group are

18  completely separate operations.  *See, e.g.*, Walter Decl. Exh. B at 11:57-12:9 (explaining that

19  "Upon receipt of the data record, storage cluster 501 forwards the data record…. to store the data

20  record… in cache memory 512," and that later on in the process, "storage control unit 107 writes

21  the data record from its cache memory into a selected redundancy group of the disk drives.").

22  This passage not only demonstrates that cache memory and redundancy group are not the same,

23  but that, in fact, the cache is "associated with" the storage control unit *of which it is a part* and not

24  with a particular redundancy group.

25         Sun's analysis of front-end versus back-end processes represents another attempt

26  to rewrite the claims so as to contradict definitions from the specification.  Sun explains that "the

27  _____

28  [5] Other locations where the specification defines "redundancy group" to mean disks are found *e.g.*
    at 2:5-11, and 3:2-9, among others.

1    front-end operations, such as the write commands from the host processor to the data storage

2    subsystems, are completely decoupled from the back-end operations, such as aggregating groups

3    of data records in cache and transferring them to disk in bulk." Sun Opp. at 17. This argument is

4    self-defeating because the specification defines the channel commands, which put the data record

5    in cache memory as *front-end*, whereas it defines writing to the redundancy group as *backend*.

6    *See* Walter Decl. Exh. B at 6:55-57 (equating front-end with channel transfer operations and

7    backend with device transfer operations); *id.* at 9:57-10:58 (defining the "channel commands"

8    used by a host processor to communicate with the DASD-emulating storage system); *id.* 6:5-31

9    (describing the process of writing to redundancy groups through "backend channels 108").

10   Therefore, according to Sun's logic, the "backend" write to the redundancy group is not complete

11   until the data record *leaves* the front-end cache and *enters* the backend redundancy group. Thus

12   the *very* front-end/back-end distinction Sun cites for the proposition that the completion of a write

13   to the redundancy group means writing to cache, actually distinguishes the redundancy group

14   from the cache as separate entities requiring separate write operations.

15           Sun also uses a passage from the specification, describing when the "write

16   complete" message is sent to the host processor, to justify its position that completion of the write

17   to the redundancy group from the host processor's perspective is all that matters. *See* Sun Opp. at

18   15 (citing passages from the specification describing a sequence in which the host processor is

19   given a "write complete" message before the data record is written to the redundancy group). In

20   fact, the specification provides at least two conflicting options regarding when the "write

21   complete" message is sent to the host processor. The passage cited by Sun, as discussed above,

22   discloses sending "write complete" to the host processor before writing to the redundancy group.

23   *See* Walter Decl. Exh. B at 11:62-12:7. But Figure 6, the figure purportedly described by the

24   cited passage of the specification, discloses the "write complete" message being sent to the host

25   processor *after* the data record is written out to disk. According to Sun's own characterization of

26   the "write complete" message as defining when the write to a redundancy group is complete, the

27   specification actually discloses two embodiments, one requiring write to cache, and one requiring

28   write to disks. The fact that the specification discloses both options, even in two locations

1   purporting to describe the same thing, demonstrates that *when* the host processor receives a "write
2   complete" message has *nothing* to do with how the patent defines "cache memory" and
3   "redundancy group."

4              Sun's construction would therefore require the Court to redefine both "redundancy
5   group" and "cache memory" giving them a different meaning for the purpose of these claims than
6   they have in the specification.  This is exactly what Sun has been telling the Court it cannot do.
7   Sun's construction depends on the idea that the "single embodiment" in the specification must be
8   covered by all the claims.   But this purported "single embodiment" includes multiple
9   "redundancy groups" and a "cache memory" that are not the same thing.  By asking the Court to
10  equate these separate things, Sun is in fact seeking claims that do *not* cover the very embodiment
11  it says must be covered by all the claims.  Sun's construction purports to respect the "sole
12  embodiment" of the specification by changing the definitions provided by the specification in
13  order to protect an order of operations that the specification does not require.  In order to avoid
14  performing steps in an order which the claims require, Sun would completely redefine the nature
15  of the steps – turning them into something they never were, and the specification requires them
16  not to be.

17             NetApp's proposed construction will assist the jury by clarifying the meaning of
18  "in response to" / "responsive to," that writing a data record to a redundancy group means writing
19  the data record to the disks that make up that redundancy group, and that a "redundancy group"
20  refers to a single redundancy group.  NetApp's construction also gives effect to the requirement
21  that the receipt of data records precede the selection of space for writing them.  For these reasons,
22  the Court should adopt NetApp's proposed construction.

23

24

25

26

27

28

## C.     U.S. PATENT NO. 5,749,095

### 1.  "Completing [a] Write Operation…"  (Claims 1, 11, and 17)

| Term | NetApp's Construction | Sun's Construction |
|---|---|---|
| "Completing [a] Write Operation Within [a] Local Processing Node" | Transferring the write data from an initiating processor to a system interface. | Sun contends this phrase does not require construction because the phrase is clear on its face.  However, if the Court decides the construe this phrase, the phrase should be construed to mean: "data for the write operation (1) is provided to subsequent read operations within the local processing node to the same address as the write operation and (2) is or will be coherent within distributed shared memory." |
| "Completing [a] Write Operation With Respect to [a] Processor" | Transferring the write data from an initiating processor to a system interface. | Sun contends this phrase does not require construction because the phrase is clear on its face.  However, if the Court decides the construe this phrase, the phrase should be construed to mean: "data for the write operation (1) is provided to subsequent read operations by a processor to the same address as the write operation and (2) is or will be coherent within distributed shared memory." |

As explained in NetApp's opening brief, when properly construed in view of the written description of the '095 patent, a write operation is complete when the data is transferred to the system interface.  In contrast, Sun's position is at odds with the intrinsic evidence and the law.  As a result, the Court should adopt NetApp's proposed constructions.

### a.     Sun's Argument That The Claims Are "Clear On [Their] Face To [A] Person Of Ordinary Skill In The Art" Is Irrelevant

Sun first proposes that the Court provide the disputed claim language to the jury without construction because "[t]he meaning of completing a write operation *is clear to a person of ordinary skill in the art*."  Sun Opp. at 26 (emphasis added).  As support for this argument, Sun cites the declaration of its expert (Dr. Donald Alpert), providing his understanding of the claim language.  *Id.*  Sun, however, cites no legal support for the proposition that claim construction is unnecessary if the claim language would be understood by a skilled artisan, nor is any support to be found in the case law.  To be sure, the Federal Circuit has stated that for some "commonly

understood words" claim construction may be resolved by lay judges using "the application of the widely accepted meaning of [those] words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Sun, however, does not argue that the phrase at issue here is "commonly understood" such that it could be applied by a jury, but instead merely that its *expert* purports to comprehend the phrase's meaning. Sun's argument, therefore, is without merit.

> **b.** **The "Provided To Subsequent Read Operations . . . To The Same Address" Requirement of Sun's Alternative Construction Lacks Support In Either The Claim Language Or The Specification Of The '095 Patent**

Falling back from its argument that the claim language is supposedly "clear on its face," Sun proposes two separate two-part definitions for the claim terms recited in claims 1, 11, and 17. Part (1) of Sun's proposed constructions define write completion as "[when] data for the write operation . . . is provided to subsequent read operations . . . to the same address as the write operation." The language of the claims, however, provide no support for this construction. In fact, the word "read" does not appear in any of the claims of the '095 patent, nor is the ability to read data stated or even implied to be a necessary predicate to the completion of a write.

The only supporting evidence that Sun cites consists of *extrinsic* evidence: (1) the opinion of its expert and (2) two articles published years before the filing date of the '095 patent by individuals having no relation to the '095 patent's named inventor. The Federal Circuit has repeatedly cautioned against reliance upon extrinsic evidence to improperly alter the meaning provided by the intrinsic evidence. *See*, *e.g.*, *Phillips*, 415 F.3d at 1318. Here, Sun's proposed construction ignores the intrinsic record. As explained in NetApp's opening brief, the specification of the '095 patent establishes the centrality of the system interface to the claimed invention and provides clear support for its proposed construction – that write completion occurs when the data is transferred to the system interface. For example, the patent teaches: "[d]uring step 322, the data is received and stored *by system interface 24*. The write operation *is thereby complete with respect to the initiating processor 16*." *See* Walter Decl. Exh. C at 28:48-51 (emphasis added); *see also id.* at 29:47-49 ("Since the fast write stream transactions *are completed* from processors 16 *by storing the transaction into SMP in queue 94* [of the system

interface shown in FIG. 3]").  The opinion of Sun's expert combined with vague references to unrelated articles cannot alter the proper construction as provided by the intrinsic record.

### c.    The "Is Or Will Be Coherent" Requirement Of Sun's Alternative Construction Is Unsupportable

Part (2) of Sun's proposed constructions define write completion as "[when the data] is or will be coherent within distributed shared memory."  Again, there is nothing in the context of the claim language to support Sun's construction.  To the contrary, the claims expressly recite the timing relationship between write completion and coherency operation, providing that one class of writes complete *prior* to coherency and the other class of writes complete *subsequent* to coherency.  Sun's "is or will be coherent" proposal is, at best, redundant of the express language of the claims, and is at worst, vague and confusing as to temporal relationship between coherency and write completion.

### d.    Sun's Criticism Of NetApp's Proposed Construction Is Logically Flawed

Sun next criticizes NetApp's proposed construction based on the argument that "[t]he specification is replete with examples of write operations that are completed 'subsequent to' the completion of the coherency activity."  Sun Opp. at 27 (emphasis added).  In effect, Sun urges that by requiring transferal to the system interface, NetApp's construction of write completion is inconsistent with the disclosed invention.  As discussed above, the specification of the '095 patent expressly equates write completion with transferal to the system interface.  Indeed, Sun admits that asserted claim 11 includes "an express limitation providing that the 'system interface' 'completes' the write operation."  Sun Opp. at 29.  Thus, both the specification and claims support NetApp's construction.

Rather than cite to actual support in the specification, Sun instead uses flawed logic in an attempt to manufacture such support.  Sun argues that "[a] write operation may be completed without transferring data to other caches in the system by ensuring that any outdated copies are 'invalidated.'"  *Id.* at 28.  The logical flaw in Sun's argument is that it assumes without any support that a write is completed before its data is transferred, *i.e.*, Sun's argument relies on its own conclusion as a premise.  This is confusion, not a logical argument.  When Sun's flawed

1  premise is removed, NetApp's proposed construction is entirely consistent with the language of

2  the claims – a write request is complete when its data is transferred to the system interface. Using

3  this definition, Sun's example of a write that is stored locally for a period of time rather than

4  being transferred immediately to the system interface simply is not yet completed.

5           **e.**        **Sun Misapplies The "Rules of Claim Construction"**

6        Finally, Sun purports to apply a number of "rules of claim construction," most of

7  which amount to no more than variations on the doctrine of claim differentiation. That doctrine

8  creates a presumption that "each claim in a patent has a different scope." *Sinorgchem Co.*

9  *Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1139 (Fed. Cir. 2008). As above, *see supra* at

10  2-3, Sun misapplies this doctrine.

11        As to Sun's comparisons of independent claims 1, 11, and 17, NetApp's proposed

12  construction does not render any of those claims of identical scope, and therefore, does not

13  implicate the doctrine. Instead, Sun argues that, because the claims use different language to

14  describe a specific aspect of the disclosed invention, the relevant portions of the claim must be

15  construed to have a different scope. The Federal Circuit has made clear, however, that "that two

16  claims with different terminology can define the exact same subject matter." *Curtiss-Wright*

17  *Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1380 (Fed. Cir. 2006).

18        Further, even if NetApp's proposed construction did result in multiple claims

19  having identical scope, that would not end the inquiry. Instead, it would still be necessary to look

20  to the intrinsic evidence to determine the proper claim scope. *Andersen Corp. v. Fiber*

21  *Composites*, *LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007). Here, the specification unambiguously

22  equates write completion with transferal to the system interface, which would negate Sun's

23  purported "presumption." *Id.*

24        Finally, as to Sun's argument that NetApp's construction reads limitations into the

25  claims, Sun itself seeks to construe write completion on the basis of when the written data can be

26  read. That construction has no support in the claim language, thereby violating the very rule Sun

27  purports to enforce by grafting a read requirement into a claim that includes no such language.

28

1

## D.    U.S. PATENT NO. 6,873,630

2

### 1.  "Portion" / "Element"  (Claims 3, 5, 8, 13-15, 21-23, 45-48, 50, 52, 73, 76, 79, 89, 113, 114, 116, 117)

3

| Term | NetApp's Construction | Sun's Construction |
|------|----------------------|--------------------|
| "Portion [of a] Communication" | The fraction or portion of a frame carried by one channel. | Sun contends this phrase does not require construction because the phrase is clear on its face. |
| "Element [of a] Communication" | A portion (e.g., a byte) of a mini-frame that is individually encoded for transmission across one of a plurality of logical channels, where a mini-frame is a fraction or portion of a communication received from or sent to a media access control layer from a physical layer device and that is carried by one channel. | Sun contends this phrase does not require construction because the phrase is clear on its face. |

The '630 patent pertains strictly to a technique for striping data communications *below* the MAC layer.  Indeed, the patent disclaims striping above the MAC layer, explaining the shortcomings of such an approach and distinguishing it as prior art.  *See* Walter Decl. Exh. D at 8:22-41.  By requiring "portion [of a] communication" to be a fraction of a "frame," which the patent defines as being the unit of information received from a MAC layer, NetApp's construction reflects these teachings that the purported invention is directed to striping *below* the MAC layer.    Sun's position does not comport with the intrinsic evidence or the law.  Consequently, the Court should adopt NetApp's proposed construction.

### a.    The Claim Terms Require Construction

Sun's own arguments belie the notion that the vague claim terms "portion of a communication" and "element of a communication" require no construction.  Indeed, Sun even admits the word "element" can have different meanings from one claim to the next.  *See* Sun Opp. at 43 ("NetApp's proposed construction conflates at least two different uses of 'elements' in the claims.").  If so, how would a jury know which "plain and ordinary meaning" to use?

More importantly, the Federal Circuit has explained that even seemingly simple words must be construed when reliance on their ordinary meaning fails to resolve the parties' claim scope dispute.  *See O2 Micro International Ltd. v. Beyond Innovation Technology Co.*, 521

F.3d 1351, 1361-1362 (Fed. Cir. 2008) (district court erred by failing to construe "only if" to determine whether that term permitted a commonly understood exception). The issue here—whether the claims cover data striping occurring above the MAC layer—cannot be resolved by reference to the terms' so-called "ordinary" meanings. NetApp's construction for "portion [of a] communication" makes clear that the claims of the '630 are limited to data striping that is done on data *frames* that are already packaged by the MAC layer; Sun disagrees with this view. *See* Sun Opp. at 41 ("NetApp's addition of the italicized language [requiring a portion of a communication to be received from or sent to a MAC layer] is wrong[.]"). This important claim interpretation dispute simply cannot be resolved by the jury by reference to vague claim terms such as "portion of a communication." It should thus be resolved by the Court.

> **b.    The '630 Patent Claims Should Be Limited To Data Striping Below The MAC Layer**

Sun holds fast to its position that the claims cover data striping above the MAC layer. *See* Sun Opp. at 37 ("[S]ome (but not all) claims require the communication be received from a MAC module[.]"). NetApp's proposed construction corrects this misunderstanding and clarifies that apportionment of the "communication"—whether it be a data stream or a single frame[6]—is accomplished by subdividing each individual "frame," already packaged by the MAC layer, into mini-frames. Acampora Decl. at 3-4.

Sun's position to the contrary is untenable, as the patent disparages, distinguishes, and plainly disavows above-the-MAC data striping:

> As one skilled in the art will appreciate, striping data across multiple channels may be performed at different levels of a network protocol stack. For example, *if implemented above the MAC layer (e.g., as with 802.3 link aggregation) multiple network "flows" or "conversations" must be distributed and collected and almost all of the network interface hardware . . . must be duplicated.* In addition, the speed of an individual flow during such "flow striping" is limited to the speed of an individual channel.

---

[6] Contrary to Sun's repeated contentions, *see, e.g.,* Sun Opp. at 33-38, 40-41, NetApp has never disputed that the claimed methods cover the transmission of multiple frames. The intent of NetApp's proposed construction, rather, is to make clear that apportionment of the "communication"—whether it be a data stream or a single frame—is accomplished by subdividing each individual frame, already packaged by the MAC layer into mini-frames. In other words, NetApp's contention is that "portion of a communication" comprises fractions of "frames," but not necessarily fractions of "a" frame. Thus, Sun's quibble regarding the word "a" misses the point entirely.

1

2

3

> In contrast, one or more embodiments of the invention discussed herein perform striping of network data at a lower level in the network protocol stack. . . . *Because striping is done with the contents of individual MAC frames or packets in these embodiments, only Physical layer resources need to be duplicated.*

4   *See* Walter Decl. Exh. D at 8:22-41.  First, this passage admits above-the-MAC data striping as

5   prior art.  Techniques such as link aggregation were not only known at the time, but were already

6   being standardized by the IEEE as part of the Ethernet protocol.  Second, this passage disparages

7   above-the-MAC striping by explaining that such techniques (1) do not increase data bandwidth

8   because they still limit transmission to a single logical channel, and (2) require duplication of

9   equipment in higher levels of the network protocol stack.  Finally, the language leaves little doubt

10  that the patent distinguishes below-the-MAC data traffic ("frames" and "mini-frames") from

11  above-the-MAC data traffic ("flows" and "conversations"), and disclaims the latter ("In contrast,

12  one or more embodiments of the invention discussed herein perform striping of network data at a

13  lower level in the network protocol stack.").  "Where the general summary or description of the

14  invention describes a feature of the invention . . . and criticizes other products . . . that lack that

15  same feature, this operates as a clear disavowal of these other products."  *AstraZeneca AB,*

16  *Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharmaceutical Co. Inc.,* 384 F.3d 1333, 1339-1340

17  (Fed. Cir. 2004); *see also On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331,

18  1340 (Fed. Cir. 2006) ("When the scope of the invention is clearly stated in the specification, and

19  is described as the advantage and distinction of the invention, it is not necessary to disavow

20  explicitly a different scope.").  Sun's request that the patent be understood to encompass such

21  disclaimed features should thus be rejected.

22              Indeed, as NetApp explained in its opening brief, every affirmative teaching in the

23  specification confirms this disavowal of claim scope and re-affirms that the invention is strictly

24  limited to *below*-the-MAC data striping.  For example:

25  - The abstract describes the alleged invention as an "Ethernet" (a layer 2
       protocol) architecture that works by manipulating "frames," which is only
26       possible *below* the MAC layer.  Walter Decl. Exh. D at Abstract.

27  - Every figure in the specification depicts the distributor / collector module,
       responsible for striping and reassembling data, to be *below* the MAC layer.
28       *See e.g., id.* at Fig. 1.

1

- The specification describes the invention in terms of "frames" and "mini-
2       frames"—referring to the latter 45 times—confirming that the patent's
        teachings are confined *below* the MAC layer. *See, e.g., id.* at 5:48-51, 5:51-53.

3           Against the backdrop of these clear teachings in the specification, Sun even agreed

4   to a number of constructions that comport with the understanding that the '630 patent pertains

5   strictly to below-the-MAC data striping.  For instance, Sun has agreed that the "distributor"

6   divides "Ethernet frame[s] received from a MAC module."  *See* Nathan Decl. Exh. A.  Likewise,

7   Sun has agreed that the "collector" module "reassembles an Ethernet frame to be provided to a

8   MAC layer."  *Id.*  Having agreed to these constructions, Sun's position that some claims may

9   cover above-the-MAC striping is puzzling indeed.  Nevertheless, claims simply cannot be broader

10  in scope than the invention that is set forth in the specification.  *See On Demand*, 442 F.3d at

11  1340.  Having disclaimed above-the-MAC data striping and having affirmatively focused on the

12  opposite, the '630 patent is simply not entitled to claim above-the-MAC striping.

13          NetApp's construction of the claim term "element [of a] communication"

14  reinforces the below-the-MAC limitation by making clear that an "element" is a further

15  subdivision of a "frame."  The specification firmly supports this.  Indeed, figures 5A to 5D—the

16  very figures that Sun's expert relies on—makes clear that "elements" are in fact the bytes in a

17  mini-frame.  These figures (a portion of Fig. 5B appears below) show four separate streams of

18  data, each of which is depicted as a solid line, that result from striping the data stream shown in

19  Figure 4. *Id.* at 13:14-17.

20

21

22

23

24

25

26  13:47-50.  Thus, the first mini-frame in Figure 5B comprises the series of hexagons (i.e., bytes)

27  from "SMD" ("Start of Mini-frame Delimiter") to "EMD" ("End of Mini-frame Delimiter").  *Id.*

28  at 11:6-10.  The row immediately above, depicting the same data stream, shows numbered bytes

from the original data stream cycling through the figures in a round-robin fashion—preamble byte P1 is in Figure 5A, preamble byte P2 is in Figure 5B, . . . and so on.  According to these figures, then, it is clear that each individual byte corresponds to an "element" described in 6:67-7:6, because it is these individual bytes that are being "distributed among multiple logical channels . . . on a round robin basis."  The specification confirms the drawings, teaching that the elements are distributed among multiple channels to form a mini-frame on each channel:

> In short[,] individual frame elements (e.g., bytes) are distributed among multiple logical channels . . . on a round-robin basis.  Each channel thus carries one "mini-frame" or "mini-packet," the contents of which will be reunited with those of the other mini-frames at the receiving entity.

*Id.* at 6:67-7:6.

### d.    Sun's Claim Differentiation Arguments Fail

In opposing NetApp's constructions, Sun repeatedly raises claim differentiation, stating, for instance, that NetApp's construction of "portion [of a] communication" "eviscerates any distinction" in the meanings of different claims because some dependent claims actually use the word "frame" instead of "communication."  But claim differentiation is by no means a rigid rule, and "practice has long recognized that claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways.[7]"  *Id.*  The Federal Circuit has explained:

> Different claims with different words can, of course, define different subject matter within the ambit of the invention.  On the other hand, claim drafters can also use different terms to define the exact same subject matter.  Indeed this court has acknowledged that two claims with different terminology can define the exact same subject matter.  . . .  In this context, this court has cautioned that claim differentiation is a guide, not a rigid rule.

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1380-1381 (Fed. Cir. 2006) (internal citations omitted).  And, one thing is crystal clear: claim differentiation cannot broaden a claim beyond its proper scope.  *See id.* at 1381 (vacating a district court's claim construction because its reliance on claim differentiation contradicted the meaning of the claim and was inconsistent with the overall context of the invention).

---

[7] Indeed, this appears to be precisely the strategy adopted by the '630 patent, which, though disclosing only a single embodiment to explain the invention, employs 125 claims to claim it.

1    Again, Sun's reliance on claim differentiation is simply misplaced.  With respect

2    to claim 2, Sun argues that NetApp's construction renders it superfluous because it ostensibly

3    limits the term "communication" in its parent claim to an "Ethernet frame."  Sun Opp. at 35.  But

4    Sun is wrong.  Not all frames are Ethernet frames.  Indeed, the '630 patent itself defines the word

5    "frame" to be broader than just Ethernet frames.  Walter Decl. Exh. D at 5:47-50.  As such,

6    equating "communication" with "frame" does not render any claim superfluous.  Claim 1

7    includes within its scope all frame-based layer 2 protocols such as token ring, whereas claim 2 is

8    limited to just Ethernet.  This interpretation makes perfect sense in light of the background

9    section of the patent, which lists several layer 2 architectures before acknowledging Ethernet as

10   the most advantageous of the bunch.  *Id.* at 1:54-2:9.

11   For similar reasons, Sun's claim differentiation attacks against NetApp's "element

12   [of a] communication" construction are without merit.  No dependent claim is made completely

13   superfluous by NetApp's construction.  True, dependent claim 53 uses the term "mini-frame."  *Id.*

14   at 21:56-61.   But its parent claim 25 does not use the disputed term "portion [of a]

15   communication."  *Id.* at 17:47-61.  Thus, claim 53 is not rendered superfluous by equating

16   "portion [of a] communication" with "mini-frame."  True, "medium access control module" is

17   recited in claim 3 but not claim 15.  But these two claims are completely different; claim 3 is a

18   method of "transmitting" whereas claim 15 is a method of "receiving."  *Compare id.* at 15:8-27

19   *with id.* at 16:32-51.  Thus, claim 15 is not rendered superfluous by the addition of the "medium

20   access control module" limitation.  True, dependent claim 5 introduces an "encoding" limitation.

21   *See id.* at 15:32-39.  But it additionally requires that the encoding be done by "a first physical

22   coding module," "across a second interface," and that the data be converted "into a series of

23   codes."  *Id.*  Thus, claim 5 is not superfluous to a parent claim that requires only *some form* of

24   data encoding.

25   In any event, even if the presumption of different meaning is successfully raised,

26   claims cannot have broader scope than what can be supported by the specification.  The fact of

27   the matter is, the '630 patent never once explains how striping could be accomplished above the

28

1    MAC layer, and instead disparages, distinguishes, and disclaims it. *Id.* at 8:22-41. The patent

2    cannot claim what it does not teach, even if some of its claims are construed to be superfluous.

3                                              **III.**

4                                          **CONCLUSION**

5                   For the aforementioned reasons, the Court should adopt NetApp's proposed

6    constructions and reject Sun's proposed constructions.

7

8    Dated: August 1, 2008                    WEIL, GOTSHAL & MANGES LLP

9

10                                    By:   */s/ Edward R. Reines*
                                            _____
11                                          Edward R. Reines
                                            Attorneys for Plaintiff-Counterclaim Defendant
12                                          NETAPP, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

        I declare that I am employed with the law firm of Weil, Gotshal & Manges LLP, whose address is 201 Redwood Shores Parkway, Redwood Shores, California 94065-1175 (hereinafter "WGM"). I am not a party to the within cause, and I am over the age of eighteen years. I further declare that on August 1, 2008, I served a copy of:

**NETAPP'S REPLY TO SUN MICROSYSTEMS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

        [  ]   **BY U.S. MAIL** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, addressed as follows, for collection and mailing at WGM in accordance with WGM's ordinary business practices. I am readily familiar with WGM's practice for collection and processing of mail, and know that in the ordinary course of WGM's business practice that the document(s) described above will be deposited with the U.S. Postal Service on the same date as sworn to below.

        [  ]   **BY FACSIMILE** by sending a true copy from WGM's facsimile transmission telephone number of 650-802-3100 to the fax number(s) set forth in the service list below. The transmission was reported as complete and without error. The transmission report was properly issued by the transmitting facsimile machine.

        [X]   **BY ELECTRONIC SERVICE** by electronically mailing a true and correct copy through WGM's electronic mail system to the email address(es) set forth in the service list below.

        [  ]   **BY OVERNIGHT DELIVERY** by placing a true copy thereof enclosed in a sealed envelope with overnight delivery fees provided for, addressed as follows, for collection by Federal Express at WGM in accordance with WGM's ordinary business practices. I am readily familiar with WGM's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of WGM's business practice the document(s) described above will be deposited by an employee or agent of WGM in a box or other facility regularly maintained by Federal Express for collection on the same day that the document(s) are placed at WGM.

        [  ]   **BY PERSONAL SERVICE** by placing a true copy thereof enclosed in a sealed envelope to be delivered by messenger to the offices of the addressee(s) (and left with an employee or person in charge of addressee's office), as stated below, during ordinary business hours on August 1, 2008.

| | |
|---|---|
| **Mark Fowler** | **[  ] by U.S. Mail** |
| **mark.fowler@dlapiper.com** | **[  ] by fax** |
| **David L. Alberti** | **[X]by email** |
| **david.alberti@dlapiper.com** | **[  ]by overnight delivery** |
| **Christine K. Corbett** | **[  ]by hand** |
| **Christine.corbett@dlapiper.com** | |
| **Yakov Zolotorev** | |
| **yakov.zolotorev@dlapiper.com** | |
| **Carrie L. Williamson** | |
| **carrie.williamson@dlapiper.com** | |
| **DLA Piper US LLP** | |
| **2000 University Avenue** | |
| **East Palo Alto, CA 94303** | |
| **Tel: (650) 833-2000** | |
| **Fax: (650) 833-2001** | |

| | |
|---|---|
| **Clayton Thompson** | [   ]by U.S. Mail |
| clayton.thompson@dlapiper.com | [   ]by fax |
| **DLA Piper US LLP** | [X]by email |
| **1775 Wiehle Avenue, Suite 400** | [   ]by overnight delivery |
| **Reston, VA 20190-5159** | [   ]by hand |
| **Tel: (703) 773-4000** | |
| **Fax: (703) 773-5000** | |

| | |
|---|---|
| **Clyde M. Siebman, Lead Attorney** | [   ]by U.S. Mail |
| clydesiebman@siebman.com | [   ]by fax |
| **SIEBMAN, REYNOLDS, BURG &** | [X]by email |
| **PHILLIPS, LLC** | [   ]by overnight delivery |
| **Federal Courthouse Square** | [   ]by hand |
| **300 N. Travis Street** | |
| **Sherman, TX 75090** | |
| **Tel: (903) 870-0070** | |
| **Fax: (903) 870-0066** | |

**Attorney for Plaintiff**
**and Counter-Defendant**
**Sun Microsystems, Inc.**

Executed on August 1, 2008 at Redwood Shores, California.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Jill J. Ho*
Jill J. Ho